HORD v ENVIRONMENTAL RESEARCH INSTITUTE OF MICHIGAN
(AFTER REMAND)

Docket No. 115369. Decided October 10, 2000. On application by the defendant for leave to appeal, the Supreme Court, in lieu of granting leave, reversed the judgments of the Court of Appeals and the circuit court. Rehearing denied *post*, 1218.

R. Michael Hord brought an action in the Washtenaw Circuit Court against Environmental Research Institute of Michigan (ERIM), alleging that, in offering him employment in Michigan, ERIM had misled him regarding its financial soundness and its ability and willingness to provide long-term funding for the research and development projects on which he would work. The court, Donald E. Shelton, J., submitted the case to a jury on both a standard fraud claim involving fraudulent misrepresentation and a silent fraud theory. The jury returned a verdict for the plaintiff, but did not specify the theory on which its award was based. The Court of Appeals, WAHLS and GRIBBS, JJ. (HOEKSTRA, P.J., dissenting), affirmed. 228 Mich App 638 (1998) (Docket No. 200481). The Supreme Court remanded the case to the Court of Appeals for reconsideration in light of *M&D, Inc v McConkey*, 231 Mich App 22 (1998). On remand, the Court of Appeals, GRIBBS and MURPHY, JJ. (HOEKSTRA, P.J., dissenting), again affirmed. 237 Mich App 95 (1999). The defendant seeks leave to appeal.

In an opinion per curiam, signed by Chief Justice WEAVER, and Justices TAYLOR, CORRIGAN, YOUNG, and MARKMAN, the Supreme Court *held*:

The plaintiff failed to present evidence sufficient to establish either fraudulent misrepresentation or silent fraud. The claim of fraudulent misrepresentation must fail because the defendant did not make any false statement. Fraudulent misrepresentation requires a false representation by the defendant. A plaintiff's subjective misunderstanding of information that is not objectively false or misleading cannot mean that a defendant has committed the tort of fraudulent misrepresentation. There is no claim that the financial statement covering the fiscal year ending in 1991 was in any way false or misleading. Although the plaintiff claims he inferred from the statement that the defendant's financial condition was

consistent with the statement, the statement itself was not a representation to that effect. Further, mere nondisclosure of information is insufficient to constitute silent fraud; there must be circumstances that establish a legal duty to make a disclosure.

Reversed.

Justice KELLY, joined by Justice CAVANAGH, dissenting, stated that the plaintiff offered sufficient proofs at trial to establish his case for fraudulent misrepresentation and concealment. The majority has substituted its judgment for that of the jury, the trial judge, and a Court of Appeals panel that rejected the defendant's claims on two separate occasions. The jury was the proper arbiter of the facts and of the witnesses' credibility.

*Green, Green, Adams, Palmer & Craig, P.C.* (*Philip Green*), for the plaintiff-appellee.

*Dickinson, Wright, P.L.L.C.* (by *Elizabeth M. Pezzetti*), for the defendant-appellant.

Amicus Curiae:

*Clark Hill, P.L.C.* (by *Duane L. Tarnacki, J. Walker Henry,* and *Frederick R. Damm*), for Michigan Manufacturers Association.

AFTER REMAND

PER CURIAM. The plaintiff accepted a job with the defendant and moved to Michigan from New Jersey. He was laid off about a year later. He sued, alleging that the company had misrepresented its financial health and that he would not have accepted the position if he had known the actual situation. There was a jury trial resulting in a verdict in the plaintiff's favor. Following a remand from this Court, the Court of Appeals affirmed.

We conclude that the plaintiff presented insufficient evidence to establish fraud, and that the defendant was entitled to a directed verdict. We therefore

reverse the judgments of the Court of Appeals and the circuit court.

I

The plaintiff has an extensive background in high-performance parallel computing. In 1992, he was working for General Electric in its Aerospace Division. On learning of his employer's plans to reorganize its operations and sell off that division, the plaintiff began to look for a new job. He became acquainted with an employee of defendant Environmental Research Institute of Michigan (ERIM) through a professional society, and inquired about the possibility of going to work for ERIM. He was eventually contacted by Claron Swonger, manager of ERIM's image processing systems division, and met Mr. Swonger for an interview in September or October of 1992.

According to the plaintiff, Mr. Swonger spoke at length about ERIM, describing its organization, history, and commitment to research. The conversation included the possibility of establishing a high-performance computer program that would involve the plaintiff. Mr. Swonger gave the plaintiff considerable printed material, including brochures about equipment, technical papers, organizational charts, and an operating summary that contained financial data through the fiscal year that ended September 30, 1991.

In early January 1993, Mr. Swonger offered the plaintiff a position with ERIM, which the plaintiff accepted. He sold his New Jersey home, moved to

Ann Arbor, and began his employment with ERIM in March 1993.

Apparently for economic reasons, ERIM reduced plaintiff's duties and compensation by twenty percent effective January 1, 1994, and eventually gave him a lay-off notice in July 1994. He chose, instead, to resign in exchange for a consulting contract.

In July 1995, the plaintiff filed this action, alleging that ERIM had misled him regarding its financial soundness and its ability and willingness to provide long-term funding for the research and development projects on which he would work. The circuit court denied ERIM's motion for a directed verdict and the case was submitted to the jury on both a standard fraud claim involving fraudulent misrepresentation and a "silent fraud" theory. The jury returned a verdict in the plaintiff's favor in the amount of $175,000. The verdict did not specify the theory on which the award was based.

ERIM appealed, and the Court of Appeals initially affirmed in a two-to-one decision. 228 Mich App 638; 579 NW2d 133 (1998). ERIM filed an application for leave to appeal to this Court, and on March 23, 1999, we entered an order remanding to the Court of Appeals for reconsideration in light of *M&D, Inc v McConkey*, 231 Mich App 22; 585 NW2d 33 (1998).[1]

On remand, the Court of Appeals issued another two-to-one decision, again affirming the circuit court judgment. 237 Mich App 95; 601 NW2d 892 (1999).

Defendant ERIM has filed an application for leave to appeal to this Court. For the reasons that follow, we

---

[1] 459 Mich 960.

reverse the judgments of the circuit court and the Court of Appeals.

II

The focus of the plaintiff's fraud claim is the "operating summary" that he was given along with other materials about ERIM. The operating summary, which covered the fiscal year that ended September 30, 1991, was a sixteen-page brochure that contained photographs and narrative about ERIM. It described the company's history, listed its seven locations, and presented a letter from ERIM's president about current and future projects. The brochure also contained financial statements, graphs, and notes about company benefits, bonds, leases, etc. The graphs showed steady growth in revenue and equity from 1987 to 1991.

It is the plaintiff's contention that by the time he was interviewed in late 1992 and hired in early 1993, ERIM knew that its financial situation was not so favorable. Although an operating summary had not been prepared for fiscal year 1992, company executives had received a financial statement from its auditors that showed a revenue decrease of $5 million and a twenty-five percent reduction in fee income. Also, there were seventy-three layoffs in 1992.[2]

---

[2] ERIM's position has been that its financial picture in 1992 was not worrisome, despite some reductions in revenue. For the purpose of reviewing the denial of the motion for a directed verdict, an appellate court considers the evidence and all legitimate inferences that may be drawn in the light most favorable to the nonmoving party. *Kubczak v Chemical Bank & Trust Co*, 456 Mich 653, 663; 575 NW2d 745 (1998). Using that standard, the plaintiff had presented sufficient evidence that ERIM's financial condition had worsened after the time covered by the operating summary that he was given.

III

In its initial decision, the Court of Appeals began by noting the six elements that must be proven to sustain a claim of fraudulent misrepresentation:

1. The defendant made a material representation.

2. The representation was false.

3. When the defendant made the representation, it knew that it was false, or the defendant made the representation recklessly, without any knowledge of its truth, and as a positive assertion.

4. The defendant made the representation with the intention that it should be acted on by the plaintiff.

5. The plaintiff acted in reliance on the representation.

6. The plaintiff suffered injury due to his reliance on the representation. See 228 Mich App 642.

The majority then explained why it believed the plaintiff had made out a case of fraud:

Defendant's contention that it made no affirmative misrepresentations ignores the fact that the jury could have found that defendant's presentation of its 1991 operating summary to plaintiff in September 1992 was a misrepresentation. Defendant repeatedly argues that the 1991 operating summary was clearly labeled "For the Fiscal Year Ending September 30, 1991," and, therefore, that it could not have constituted a misrepresentation regarding defendant's financial position in 1992, and that plaintiff could not have been misled by it. The flaw in this argument is exposed by simply asking: Why did defendant give plaintiff a copy of its 1991 operating summary? Clearly, the act of giving plaintiff the operating summary constituted an endorsement of its contents and a representation that the summary was somehow a reflection of defendant's current financial strength.[2] This was obviously a material representation, and the act of giving the operating summary to plaintiff during a job inter-

view allowed the jury to infer that defendant intended that plaintiff act on it. In addition, there was evidence that, at the time defendant gave plaintiff the 1991 operating summary, it had more current financial information that suggested that it was in a much weaker financial position than it was in September 1991. From this evidence, the jury could have concluded that the representation regarding defendant's financial strength was false and that defendant knew that it was false when made. Finally, plaintiff testified that he relied on this representation in making his decision to accept defendant's offer of employment, and there was evidence that plaintiff suffered injury. Consequently, we find no error in the trial court's decision to deny defendant's motions for a directed verdict and for JNOV regarding plaintiff's fraudulent misrepresentation claim.

---

[2] Defendant would have us construe its action as no more than a statement of its financial condition as of September 31, 1991. Such a construction defies common sense. When defendant gave plaintiff the operating summary in September or October 1992, it was clearly offering it as some indication of its current financial strength. Thus, the representation was not "Here is our 1991 operating summary, which is irrelevant in regard to our current financial strength." Rather, it was effectively "Here is our 1991 operating summary which reflects, at least to some degree, our current financial situation."

---

[228 Mich App 642-643.]

Our remand order directed the Court of Appeals to reconsider its decision in light of *M&D, Inc v McConkey, supra,* which principally dealt with the question of silent fraud. The Court of Appeals majority reiterated its view that there was sufficient evidence of fraudulent misrepresentation in the case, and then also concluded that the evidence supported the silent fraud theory. It explained:

Having nonetheless reviewed this matter in light of our Supreme Court's remand, we find that the evidence here also supported plaintiff's silent fraud theory. As this Court stated in *M&D, Inc, supra* at 29, quoting and adopting

Judge YOUNG's opinion in the previous *M&D, Inc v Mc-
Conkey*, 226 Mich App 801 (1997), defendant "also has a
duty to disclose ' "subsequently acquired information which
he recognizes as rendering untrue, or misleading previous
representations which, when made, were true or believed to
be true." ' " 231 Mich App 29 (1997). (Citations and empha-
sis omitted.)

We remain convinced that the jury in this case could
fairly infer that defendant showed plaintiff the 1991 operat-
ing summary with the intention that plaintiff would rely on
the information it contained. 228 Mich App 642-643. There-
fore, in addition to finding that the evidence here supports
a claim of simple fraud, we also find that defendant had a
duty in this case to disclose the subsequently acquired
information of defendant's financial position in 1992, which
clearly rendered untrue any implications from the 1991
figures. [237 Mich App 97.]

Judge HOEKSTRA dissented from both the initial deci-
sion and that on remand. In his latter opinion, he
emphasized that there was no claim that the 1991
operating summary contained false or misleading
information regarding the company's financial status
during the time covered by the report. Rather, plain-
tiff's claim was that he inferred from the 1991 figures
that the situation remained unchanged through 1992.
However, Judge HOEKSTRA interpreted *McConkey* to
establish that where the plaintiff's inference is unwar-
ranted, it cannot serve as a basis for a fraud claim. He
explained:

There is no evidence that defendant intended the 1991
operating summary to demonstrate the company's financial
condition at the time it hired plaintiff. To the contrary, the
document is clearly a report from fiscal year 1991, and any
other inferences plaintiff may have made lack a discernible
or objective basis. In addition, I see no basis for the conclu-
sion that plaintiff had a right to rely on the 1991 summary

as an accurate picture of the company's performance in fis-
cal year 1992, without some additional inquiry or affirma-
tive representation by defendant. Both of these conclusions,
that the 1991 figures were intended to represent financial
performance in 1992 and that defendant had a duty to pro-
vide additional financial information, are essential to the
majority's finding of fraud. Unfortunately, no evidence,
beyond pure speculation, supports such conclusions. [237
Mich App 98-99.]

Judge HOEKSTRA emphasized that the plaintiff never
requested more recent information during the hiring
process. Given that the report was clearly labeled as
covering fiscal year 1991, Judge HOEKSTRA found no
duty to provide additional information. He noted that
while later figures were available, they had yet to be
compiled in a report like the one defendant gave the
plaintiff.

Judge HOEKSTRA concluded that the majority's deci-
sion placed an unreasonable burden on a party in the
position of the defendant:

The most disconcerting aspect of the majority's opinion is
that it expects that defendant will anticipate plaintiff's infer-
ence and then requires defendant to take appropriate reme-
dial action. Because defendant failed to anticipate how
plaintiff would interpret its 1991 operating summary, the
majority finds that defendant has committed fraud. This
result is most troubling. To elevate an inference made by
another party's interpretation of a document that, on its
face, is clear and unambiguous, puts every supplier of infor-
mation in jeopardy for the unforeseen misinterpretation of
that information. In a case like this one, where the data
were clearly labeled as pertaining to the company's 1991 fis-
cal year, plaintiff should not be permitted to argue that he
thought the figures also represented the company's per-
formance in 1992. Plaintiff had a simple, straightforward
avenue to discover defendant's current financial condition.
He simply had to ask. Now he expects the courts to bail

him out because his assumption about defendant's financial condition was incorrect. I find it noteworthy that *McConkey* holds that fraud requires some evidence of a false representation and that knowledge, coupled with failure to disclose, does not give rise to fraud unless the party is duty-bound to disclose and intentionally suppresses the information, thereby creating a false impression. *McConkey*, [231 Mich App] 25. There is no evidence of such a duty in this case, nor do I find evidence that defendant intentionally suppressed relevant information. [237 Mich App 99-100.]

IV

In *M&D, Inc v McConkey, supra,* plaintiff M&D purchased commercial property on an "as is" basis from defendant Relenco Partnership. Defendant McConkey Real Estate handled the sale. M&D leased the property to another party for operation of a store. Two months after the store opened, it was flooded after a heavy rainfall. Evidence showed that the property had experienced flooding for many years and a principal of McConkey Real Estate testified that he had witnessed such flooding. There was no evidence that plaintiff M&D had asked whether the property experienced any flooding, however, and the defendants never made any representation on that subject. Further, the seller (Relenco) refused to prepare a seller's disclosure statement and made this refusal an explicit part of the purchase agreement. The following was included on the disclosure statement form:

Owner has never occupied this property. No representations or warranties implied as to condition. Property being sold in "as is" condition. [*Id.* at 26.]

The plaintiffs sued on various theories, including fraud. The circuit court granted summary disposition for the defendants on the fraud claim.

On appeal, the Court of Appeals reinstated the claim in *McConkey* on the authority of *Shimmons v Mortgage Corp of America*, 206 Mich App 27; 520 NW2d 670 (1994). However, it indicated that it disagreed with *Shimmons* and reversed only because it was bound by that decision.[3]

As a result, the Court of Appeals convened a conflict resolution panel in *McConkey*, which affirmed the circuit court's summary disposition on the fraud claim. 231 Mich App 22. It focused principally on the silent fraud theory, adopting in large part the opinion of Judge YOUNG in the original panel's decision.[4] That opinion had summarized the case law dealing with silent fraud and found that it did not support the conclusion in *Shimmons, supra,* that such a claim can be maintained where the purchaser proves only that the vendor knew about a defective condition and did not disclose it. Judge YOUNG had concluded:

> Our review of Michigan Supreme Court precedent regarding this issue reveals that, in every case, the fraud by nondisclosure was based upon statements by the vendor that were made in response to a specific inquiry by the purchaser, which statements were in some way incomplete or misleading. See, e.g., *Nowicki v Podgorski*, 359 Mich 18; 101 NW2d 371 (1960); *Sullivan v Ulrich*, 326 Mich 218; 40 NW2d 126 (1949); *Wolfe [v A E Kusterer*, 269 Mich 424; 257 NW 729 (1934)]. [226 Mich App 809.]

---

[3] See former Administrative Order No. 1994-4.

[4] See 226 Mich App 801.

V

In reviewing a trial court's denial of a motion for a directed verdict, we examine the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the nonmoving party. *Kubczak v Chemical Bank & Trust Co*, 456 Mich 653, 663; 575 NW2d 745 (1998). Accordingly, the threshold for obtaining a directed verdict is high. Nevertheless, contrary to the possible implication of the dissent, it is not meant to be insurmountable. Indeed, this Court has often held that a party is entitled to a grant of a directed verdict. See, e.g., *id.* at 663-664 (concluding that a directed verdict should have been granted after "making all *reasonable* inferences in plaintiff's favor" [emphasis added]); *Locke v Pachtman,* 446 Mich 216, 222-223; 521 NW2d 786 (1994) (affirming a directed verdict where no prima facie showing of liability was made).

We agree with dissenting Judge HOEKSTRA in the instant case that the plaintiff failed to present evidence to establish either fraudulent misrepresentation or silent fraud. There is no claim whatsoever that the financial statement covering the fiscal year ending in 1991 was in any way false or misleading. The plaintiff says he inferred from it that ERIM's current financial condition was consistent with that statement. However, the statement itself is not a representation to that effect. Thus, the claim of fraudulent misrepresentation must fail because ERIM did not make any false statement.

In support of its position that there was sufficient evidence to support the jury's verdict, the dissent cites testimony from *plaintiff* that he "took" the 1991

operating summary for ERIM as a representation of the financial status of the organization. However, that simply is not a reasonable interpretation of information that on its face presented data for a period that ended well before plaintiff's job interview in 1992. Fraudulent misrepresentation, of course, requires a *false representation* by the defendant. A plaintiff's subjective misunderstanding of information that is not objectively false or misleading cannot mean that a defendant has committed the tort of fraudulent misrepresentation.

The dissent indicates that there is no plausible explanation for Mr. Swonger giving plaintiff the most recent "financial report" for ERIM if his intent was not to suggest that the report showed ERIM's current financial status. However, this overlooks that the 1991 operating summary at issue was not merely a financial report, but rather was a sixteen-page brochure that included information about the history and nature of ERIM's business activities as well as financial data. It is plain that providing general background information about a company to a job applicant or potential employee is a perfectly legitimate business practice that may be of value to an individual in deciding whether to accept or continue seeking employment at that business. From all appearances, the 1991 operating summary provided to plaintiff was the most recent operating summary available for ERIM at the time of his job interview. Thus, the provision of this summary cannot reasonably be understood as some type of fraudulent misrepresentation. Indeed, there is no reasonable way that plaintiff could have expected that defendant's financial performance would simply have remained constant after the period

of time covered by the operating summary. Moreover, evidence that Mr. Swonger knew that ERIM faced some financial problems in 1992 does not show that he regarded this as being more indicative of the company's likely future performance than the 1991 operating summary that he provided to plaintiff.[5]

Turning to the question of silent fraud, we agree with the analysis of the conflict resolution panel in *McConkey* that mere nondisclosure is insufficient. There must be circumstances that establish a legal duty to make a disclosure. See *United States Fidelity & Guaranty Co v Black*, 412 Mich 99, 125; 313 NW2d 77 (1981):

> It is generally recognized that "[f]raud may be consummated by suppression of facts and of the truth, as well as by open false assertions," *Fred Macey Co v Macey*, 143 Mich 138, 153; 106 NW 722 (1906), since "a suppression of the truth may amount to a suggestion of falsehood." *Stewart v Wyoming Cattle Ranche Co*, 128 US 383, 388; 9 S Ct 101; 32 L Ed 439 (1888). In order for the suppression of information to constitute silent fraud there must be a legal or equitable duty of disclosure. See 37 Am Jur 2d, Fraud and Deceit, § 146.

As the cases cited in *McConkey* indicate, a legal duty to make a disclosure will arise most commonly in a situation where inquiries are made by the plaintiff, to which the defendant makes incomplete replies that are truthful in themselves but omit material information. See, e.g., *Groening v Opsata*, 323 Mich 73, 83-84;

---

[5] Notably, the dissent refers to ERIM having "lure[d]" plaintiff from a job in New Jersey to work for ERIM in Michigan. *Post*, p 418. While we certainly condemn actual fraud in connection with employment recruiting, there is no sound reason for this Court to adopt an unduly broad definition of "fraud" that might deter companies from appropriate recruiting of talented individuals such as plaintiff to work in Michigan.

34 NW2d 560 (1948) (buyer's inquiry regarding erosion of bluff on which house was situated); *Sullivan v Ulrich, supra* at 227-230 (buyer's inquiry regarding termites). In the instant case, the 1991 operating summary was the most recent document available in that format. It clearly identified the times for which the financial information was provided. There was no evidence that the plaintiff made any inquiry about the financial condition of the company in general or requested updated financial data in particular.[6] The information was provided with a number of other basic documents about the defendant, and was not in response to any request for information by the plaintiff.

Because the plaintiff failed to present evidence sufficient to establish either fraudulent misrepresentation or silent fraud, we reverse the judgments of the Court of Appeals and the circuit court.

WEAVER, C.J., and TAYLOR, CORRIGAN, YOUNG, and MARKMAN, JJ., concurred.

KELLY, J. I dissent from the majority because I find that plaintiff offered sufficient proofs at trial to establish his case for fraudulent misrepresentation and concealment. The majority has substituted its judgment for that of the jury, the trial judge, and a Court of Appeals panel that rejected defendant's claims on

---

[6] The plaintiff also mentions the testimony that he inquired of defendant about its policy regarding funding of research, and was told of a particular project that had been supported for ten years before it became profitable. The plaintiff does not claim that that anecdotal reference was in any way inaccurate, and it thus cannot constitute a misrepresentation. Insofar as the plaintiff inferred from that statement that the project on which he worked would be similarly funded, such a conclusion was unwarranted from the response to his inquiry.

two separate occasions. As the trial judge and the appellate panel recognized, the jury was the proper arbiter of the facts and of the witnesses' credibility. Hence, I would leave the Court of Appeals decision and the jury verdict intact by denying leave to appeal.

I

The standard of review governing appellate oversight of decisions on directed verdict motions is well settled. More than a century ago, Chief Justice THOMAS M. COOLEY articulated the high threshold for granting a directed verdict, using words that ring as true today as then.

> In determining this question [regarding the propriety of a directed verdict], we must look at the case as it appears from the plaintiff's own testimony, unqualified by any which was offered on the part of the defendants, and must concede to him any thing which he could fairly claim upon that evidence. He had a right to ask the jury to believe the case as he presented it; and, however improbable some portions of his testimony may appear to us, we can not say that the jury might not have given it full credence. It is for them, and not for the court to compare and weigh the evidence.[1]

Indeed, parties have a right to a jury verdict, free of interference from the bench. In *Hughes v John Hancock Mut Life Ins Co*,[2] we observed this obvious bedrock principle:

> "[J]udges are pronouncing no mere rigmarole when, in law cases, they charge jurors that they are the sole and exclusive judges of the credibility of the witnesses, and the weight to be given to their testimony. They are setting forth

---

[1] *Detroit & M R Co v Van Steinburg*, 17 Mich 99, 117 (1868).

[2] 351 Mich 302, 309; 88 NW2d 557 (1958).

the very substance of a jury trial as guaranteed by the Seventh Amendment to the Constitution. Its purpose and aim 'is not to preserve mere matters of form and procedure, but substance of right. This requires that questions of fact in common-law actions shall be settled by a jury, and that the court shall not assume, directly or indirectly, to take from the jury or to itself such prerogative.' "[3]

In this case, jurors faced a credibility contest. Either they believed plaintiff's allegations of fraud or they believed defendant's explanations.

The elements that plaintiff had to prove to support his case for fraudulent misrepresentation were: (1) defendant made a material representation, (2) the representation was false, (3) defendant knew that it was false when made or made it recklessly, as a positive assertion, without knowledge of its truth, (4) defendant intended plaintiff to act upon the representation, (5) plaintiff acted in reliance on it, and (6) plaintiff suffered injury as a result. *United States Fidelity & Guaranty Co v Black*, 412 Mich 99, 120-121; 313 NW2d 77 (1981).

II

Central to this case was defendant ERIM's operating summary for fiscal year 1991 that Claron Swonger, an ERIM manager, provided to plaintiff during a job interview. The summary contained financial data, projections, profits margins and an overall reflection of the state of affairs at ERIM. There was sharp disagreement

---

[3] *Hughes, supra* at 309, quoting *Reid v Maryland Casualty Co*, 63 F2d 10, 11 (CA 5, 1933); *Walker v New Mexico & S P R Co*, 165 US 593, 596; 17 S Ct 421; 41 L Ed 837 (1897).

over Swonger's intent in handing the summary to Hord.

The question of fact for the jury was whether Swonger's use of the 1991 report at the 1992 interview constituted a material misrepresentation about the current financial viability of ERIM. At trial, Hord testified:

> I took it as representative of the financial status of the organization, that if there had been any reason to caveat some of the indications in here, I would have heard them. I did not.

Swonger admitted that he had offered the 1991 report as evidence of ERIM's "financial record." The jury heard the following testimony:

> *Q.* What was your purpose in giving Mr. Hord the annual report for 1991?
> *A.* I wanted him to be able to read what the management philosophy of ERIM was as stated in that kind of a document and the material that was there, *and to show him what the record had been of the company.*
> *Q.* And when you talk about "record," you're talking about the financial record?
> *A.* Certainly including that. [Emphasis added.]

At the time of the interview, Swonger knew that ERIM had suffered an economic downturn since the summary was prepared. That knowledge, coupled with the testimony from Hord and Swonger, justified a jury determination that Swonger made an affirmative misrepresentation. Another interpretation of these facts strains credibility. The majority offers no plausible explanation why Swonger would give Hord the most recent financial report without comment, if

his intentions were not to suggest it showed the company's current financial status.

Suppose, for example, that the 1991 report had contained a financial picture worse than ERIM's 1992 financial status. Would Swonger have given it to Hord without qualifications?

Common sense dictates that Swonger would not have provided Hord with a 1991 report under those circumstances. Such a negative report, conveyed so close to the time of publication, would clearly have given the impression that things remained the same in 1992. No company does business in a vacuum. To suggest that 1991 figures convey absolutely nothing about the period that immediately follows is unconvincing. Thus, I disagree with the premise adopted by the majority. The jury was entitled to conclude that Swonger gave Hord the report as a way of demonstrating financial strength that ERIM no longer possessed.

The jury heard Swonger testify that he knew about financial problems at ERIM when he met with plaintiff.

> *Q.* Okay. So basically, certainly by December 17th when you met with Mr. Hord at ERIM you had the information that's reflected in the 1992 report, didn't you, about the diminution of revenues, the losses, or the decreases in contract income? You had that information, didn't you?
>
> *A.* I received it at least orally, yes.
>
> *Q.* Okay. And you had been receiving that information all along during the year 1992 in the monthly and quarterly reports you got?
>
> *A.* Monthly for my division.
>
> *Q.* Okay.
>
> *A.* Yes.

Indeed, Swonger, like all upper-level managers at ERIM, knew about plans already underway for a massive layoff. By the end of 1992, seventy-two employees had received layoff notices from ERIM management, and the company's profits had dropped more than $4 million from those reflected in the 1991 report.

Defense witnesses offered explanations for the decrease in profits. However, the jury was entitled to choose which version of the facts to believe. As Chief Justice COOLEY observed: Plaintiff "had a right to ask the jury to believe the case as he presented it . . . ." *Detroit & Milwaukee R Co, supra* at 117. "It is for them, and not for the court to compare and weigh the evidence." *Id.*

The most troubling aspect of the view adopted by the majority is that the per curiam analysis glosses over the context surrounding Swonger's decision to share the report with Hord. Instead, the majority strains to resolve the dispute within the four corners of the 1991 report. Taken as a whole, the facts suggest that Hord was on the receiving end of an old-fashioned sales pitch, and Swonger was pulling out all the stops to persuade him.

ERIM was attempting to lure Hord, a nationally recognized expert in high-performance computing, from a job in New Jersey to a position in Michigan. Hord made efforts to gauge the offer in terms of job security and ERIM's ability to provide a steady stream of work. He sought justification for his decision to relocate from New Jersey to Michigan. He testified that, had he known of ERIM's financial downturn, he would not have accepted the position with ERIM.

Meanwhile, Swonger, in an apparent effort to assuage Hord's concerns, sought to provide evidence of job stability. In so doing, he deliberately painted a misleading picture of the present viability of ERIM, hoping to obscure the truth: government cutbacks in the defense industry, a sketchy financial forecast, and inevitable layoffs.

III

Because a reasonable jury could have viewed these facts as sufficient to meet the elements of plaintiff's fraud claim,[4] I would deny defendant's application for leave to appeal. The United States Supreme Court in *Walker* cautioned courts against usurping the well-settled role of jurors as the ultimate arbiters of factual and credibility issues. I cannot join the majority's disregard for that caution.

CAVANAGH, J., concurred with KELLY, J.

---

[4] Contrary to the per curiam's conclusion, plaintiff also made out his case for fraudulent concealment or "silent fraud." One who remains silent when fair dealing requires him to speak may be guilty of fraudulent concealment. *Nowicki v Podgorski*, 359 Mich 18, 32; 101 NW2d 371 (1960). A party has a duty to disclose subsequently acquired information that he recognizes as rendering untrue or misleading previous representations which, when made, were true or believed to be true. *M&D, Inc v McConkey*, 231 Mich App 22, 29; 585 NW2d 33 (1998).

Even assuming that ERIM officials learned of the company's grim financial outlook only after the interview with Hord, defendants had an affirmative duty to bring those facts to Hord's attention. More than enough exists here for a jury to consider a claim of silent fraud.