ALIBRI v DETROIT/WAYNE COUNTY STADIUM AUTHORITY

Docket No. 228921. Submitted December 11, 2002, at Detroit. Decided December 27, 2002, at 9:10 A.M. Leave to appeal sought.

Freda Alibri brought an action in the Wayne Circuit Court against the Detroit/Wayne County Stadium Authority, seeking, in part, the rescission of an option to purchase realty already exercised by the defendant as part of its efforts to acquire land in downtown Detroit for the construction of stadiums and stadium parking facilities for the Detroit Tigers baseball team and the Detroit Lions football team. The court, Kaye Tertzag, J., granted partial summary disposition for the plaintiff, ruling, in part, that the plaintiff had established failure of consideration, mutual mistake, and innocent misrepresentation as grounds for rescission. The defendant appealed.

The Court of Appeals *held*:

1. The trial court erred in applying the requirements of subsections 5(4) and 5(5) of the Uniform Condemnation Procedures Act (UCPA), MCL 213.55(4) and (5), to a negotiated purchase of realty by a governmental agency having the authority to make such a purchase. No taking occurred in this case inasmuch as the defendant is a duly created building authority vested by the Legislature with the power to purchase and, if necessary, to condemn property needed for the public purpose of constructing stadiums, including acquiring sufficient parking space. MCL 123.959.

2. The trial court erred in basing its grant of summary disposition on its conclusion that the defendant did not have the present ability to condemn the realty at issue because it did not have the funding available to purchase and did not have a plan in place to use the realty in the stadium project. The requirements of UCPA subsections 5(4)(a) and 5(5), MCL 213.55(4)(a) and 213.55(5), regarding a plan and funding apply to the initiation of condemnation actions. No such action was instituted in this case. The defendant complied with subsection 5(1) of the UCPA, MCL 213.55(1), which governs purchase negotiations and requires that the condemnor make an appraisal-based, good-faith offer with respect to purchase price.

3. The trial court erred in concluding that the defendant's failure to purchase or condemn other specified property formed a basis to rescind the sale of the realty at issue. The trial court incorrectly

determined that the option agreement required the defendant to purchase the other property. Properly construed, the agreement required only that the defendant pay the plaintiff a price per square foot equal to that paid for the other property. However, the defendant did not purchase the other property and, if the defendant was required to purchase the other property, the plaintiff waived the requirement when the plaintiff delivered a deed to her realty to the defendant.

4. The trial court erred in determining that there was a failure of consideration because the defendant failed to deliver on a promise to pay the plaintiff the same price per square foot as that for other specified property that the defendant eventually did not purchase, and because the plaintiff was induced to contract with the defendant on the basis of a threat by the defendant to use its power of eminent domain. The threat of condemnation was motivation for the plaintiff to negotiate with the defendant, and it was not consideration, which is a bargained-for exchange that requires a benefit on one side, or a detriment suffered, or service done on the other. With respect to price parity, the plaintiff bargained for and received peace of mind that she would get a price no lower than the price for the other specified property had that property been purchased by the defendant. The trial court's finding that the realty at issue was purchased below market value is not supported by the evidence and is without legal merit. Moreover, mere inadequacy of consideration, unless it be so gross as to shock the conscience of the court, is not a ground for rescission.

5. The trial court erred in determining that mutual mistakes of fact regarding the defendant's ability to immediately condemn the realty at issue and the defendant's purchase of other specified property provided grounds for rescission. The first alleged mistake of fact concerns a misapplication of condemnation law that is not relevant to the negotiated purchase involved in this case. The second alleged mistake related to the occurrence or nonoccurrence of a future event and cannot serve as a basis to rescind because of mutual mistake.

6. The trial court erred in determining that innocent misrepresentations concerning the defendant's intent to immediately condemn the realty at issue if a purchase agreement was not reached and concerning the defendant's purchase of the other specified property warranted rescission. The evidence did not support any finding of misrepresentation by the defendant and detrimental reliance by the plaintiff. The plaintiff also was not misled concerning the Tigers' involvement in the project or the Tigers' eventual acquisition of the plaintiff's realty.

7. The evidence does not support the trial court's conclusion that the acquisition of the plaintiff's realty by a governmental entity with powers of eminent domain and the realty's transfer to a private entity was not good public policy. The defendant did no more than pursue the public purposes of acquiring property to build stadiums and operating necessary parking facilities.

Reversed.

1. PROPERTY — CONTRACTS FOR SALE OF REALTY — DEEDS.

A deed executed in the performance of a contract for the sale of realty operates as satisfaction and discharge of the terms of the purchase contract.

2. CONTRACTS — CONSIDERATION.

Consideration is a bargained-for exchange that requires a benefit on one side, or a detriment suffered, or service done on the other.

3. CONTRACTS — MUTUAL MISTAKE — FUTURE EVENTS.

A mutual mistake warranting the rescission of a contract must relate to a fact in existence at the time the contract is executed, not to the occurrence or nonoccurrence of a future event.

4. CONTRACTS — INNOCENT MISREPRESENTATION.

A false statement, made without knowledge of its falsity or intent to deceive, is actionable if relied upon by the other party to the contract to its detriment and if the party that made the false statement is unjustly enriched; the misrepresentation must relate to past or existing fact and not be promissory in nature.

*Butzel Long* (by *Carl Rashid, Jr.,* and *Joseph M. Rogowski, II*) for the plaintiff.

*Williams Acosta, PLLC* (by *Avery K. Williams*), for the defendant.

Before: FITZGERALD, P.J., and WILDER and COOPER, JJ.

FITZGERALD, P.J. Defendant appeals as of right the order granting plaintiff's motion for partial summary disposition pursuant to MCR 2.116(C)(10) and ordering partial rescission of an option to purchase real estate entered into by the parties on October 31,

1996.[1] The order also dismissed plaintiff's remaining claims. We reverse.

On August 20, 1996, the city of Detroit Downtown Development Authority (DDA), Wayne County, the Detroit Lions, Inc. (the Lions), and the Detroit Tigers, Inc. (the Tigers), entered into a memorandum of understanding (MOU) for the purpose of acquiring land and infrastructure for, "and construction of, a new major league baseball stadium and a new professional football stadium/entertainment center and appurtenant facilities" in downtown Detroit. The MOU provided that the county would incorporate a building authority to be known as the Detroit/Wayne County Stadium Authority pursuant to 1948 PA 31, MCL 123.951-MCL 123.965. On September 19, 1996, the Detroit/Wayne County Stadium Authority (hereafter defendant) was incorporated by the county and charged with acquiring the necessary real property to build and support the proposed stadiums.

Funding for the half-billion dollar project was proposed to come from a variety of public and private sources, including the DDA, the state of Michigan (the Michigan Strategic Fund or MSF), the county, the Tigers, and the Lions. The MSF funding of $55 million was restricted to costs associated with the land acquisition, infrastructure, and site development for the proposed new Tiger stadium. Part of the project funding was to come from bonds to be repaid by a "tourist tax" and from "parking bonds" to be funded by grant-

---

[1] Although the option covered numerous parcels of property, this lawsuit concerns only parcels located in the area of Clifford and West Columbia on the west side of Woodward Avenue in downtown Detroit that plaintiff conveyed by warranty deed to defendant on January 3, 1997, for $264,551.94. Plaintiff conveyed the east side optioned properties to defendant for $6,324,000 on the same day.

ing the Tigers the concession for parking. Pertinent to the subject of parking and additional parking, apparently located west of Woodward Avenue, the MOU provided:

> 13. PARKING.
>
> (a) *Project Area Parking.* Pursuant to the Tigers Concession/Management Agreement, the Tigers shall have the exclusive right to manage, operate and receive all revenues from all the Project Area Parking for a period coinciding with the term of such Tigers Concession/Management Agreement on terms on [sic] mutually acceptable to the parties hereto. The location and design of the Project Area Parking shall be mutually acceptable to the parties hereto.
>
> (b) *Additional Parking Area.* It is anticipated that the Authority shall acquire additional parking for the Complex at locations outside the Project Area (the "Additional Parking Areas") provided that the acquisition of such Additional Parking Areas can be financed by bond proceeds secured by the parking revenues from such Additional Parking Areas. To the extent the Authority acquires any parking facilities outside the Project Area, they shall be managed and operated by the Tigers on substantially the same terms and conditions as are set forth in Section 13(a) above, subject to the requirements of applicable law.

The building of new stadiums in downtown Detroit for the Tigers and the Lions was not a foregone conclusion, however, because the MOU included that any party to the agreement could withdraw by written notice given on or before November 1, 1996, if certain criteria were not established. The MOU would also terminate automatically if county electors did not approve the tourist tax in the November 5, 1996, general election. Defendant's acquisition of sufficient property to assure the financial viability of the project by November 1, 1996, was critical. In that regard, the MOU provided:

17. (b) Prior to November 1, 1996, the [defendant] shall investigate whether the property in the Project Area to be acquired by the [defendant] or the DDA is suitable to be taken for public purposes. The information from the investigation shall be provided to the Lions and the Tigers, either of whom may withdraw from this Memorandum upon written notice to the other parties on or before November 1, 1996, if either determines that the Costs of the Complex would be excessive, in which event this Memorandum shall terminate and none of the parties shall thereafter have any rights, liabilities or obligations under this Memorandum.

Defendant began negotiating with plaintiff in August 1996 to purchase her property on both the east side and the west side of Woodward Avenue for the stadium project. Defendant represented that it would obtain plaintiff's property and other west side properties through the exercise of the power of eminent domain, if necessary. Defendant also informed plaintiff that sufficient property had to be obtained by November 1, 1996, for the project to continue. The parties entered into an option contract on October 31, 1996, that would terminate on January 3, 1997, by which plaintiff would sell to defendant property located on both the east side and the west side of Woodward Avenue. Additional terms of the option included that it could not be assigned without plaintiff's consent and that if defendant did not exercise the option, then defendant "shall not condemn" the optioned property. The option also provided that "the per square foot price paid to Optioner for the property located on the Westside of Woodward shall be equal to the price per square foot paid by Optionee . . . to the owners of the Parcel located on Elizabeth and Park Avenue for the property located on Eliza-

beth and Park Avenue [hereafter the Abraham property]."

The option was exercised on January 3, 1997, when plaintiff conveyed by warranty deed the west side properties (hereafter the subject property) to defendant for $264,551.94. It is undisputed that the Tigers advanced the purchase money for the subject property and that all the properties covered by the option were within the resolution of necessity adopted by defendant on November 27, 1996. After exercising its option to purchase the subject property, defendant adopted a resolution on May 1, 1998, withdrawing the prior resolution of necessity, except with regard to property defendant had already acquired. After deciding to "downsize" the project, defendant entered into a second amendment of its concession and management agreement with the Tigers on April 28, 1998, by which defendant transferred the subject property to the Tigers to repay its purchase loan.

Plaintiff commenced this action on June 12, 1998. In an amended complaint filed on September 20, 1999, plaintiff alleged theories of negligent, innocent, or intentional misrepresentation, fraud, mutual mistake, promissory estoppel, and violations of federal and state due process guarantees. Plaintiff acknowledged that defendant is a government entity with the power of eminent domain to acquire property necessary for the public purpose of constructing stadiums, including acquiring sufficient property for parking. However, plaintiff contended defendant improperly used the power of eminent domain to take property from one private owner to give it to another private owner. Further, plaintiff claimed that defendant misrepresented that the subject property would not be

transferred to the Tigers (the Ilitch family), who apparently were particularly objectionable to plaintiff. However, plaintiff admitted that defendant could lawfully take plaintiff's property for stadium parking purposes, lease or enter into a concession agreement with the Tigers to collect the parking revenues, and then at some subsequent time decide to get out of the parking business and transfer the property to someone else (including the Tigers). Likewise, plaintiff acknowledged that nothing in the option contract precluded the above scenario.

Plaintiff also contended that she sold the subject property below market value out of public spirit to ensure the success of the new stadiums project. Defendant's representative testified by deposition that although plaintiff negotiated with regard to the east side properties on a "take it or leave it" basis, plaintiff was not concerned about the west side properties and accepted the appraised value for them. Plaintiff's counsel conceded defendant had an "estimate" or "this pro forma appraisal" for the west side properties, and the sales price of $267,100 noted in the deed is consistent with the appraisal for the subject property. Plaintiff's counsel contended that because plaintiff's sale was the first of the west side properties to be purchased or taken by defendant, she insisted on a price guarantee—the Abraham clause. Further, plaintiff contended that the Abraham clause was not meant to apply only "if" defendant bought the Abraham property, but was to apply "when," and included a promise by defendant that it would purchase the Abraham property.

Defendant argued in its third motion for summary disposition that plaintiff's case was dependent on

whether defendant misrepresented something to plaintiff during their purchase negotiations. Defendant argued that plaintiff had produced no evidence from the public record of the government entities involved, or from deposing any of the key officials involved, to show anything other than a bona fide intent to purchase or take the property on the east side and the west side of Woodward Avenue for purposes of building two new stadiums and acquiring sufficient parking space to support them. Moreover, defendant argued that its agreement with the Tigers, whereby the Tigers would manage all property acquired by defendant for parking, was a matter of public record. Defendant further argued that it was only after the purchase of plaintiff's property that the Tigers and the Lions reached their own agreement on parking and defendant reconsidered its plan to acquire the west side property for parking. The trial court denied defendant's motion, finding that sufficient, but unspecified, evidence existed to present the case to a jury.

On June 30, 2000, the court heard the parties' arguments regarding plaintiff's motion for summary disposition pursuant to MCR 2.116(C)(10). Plaintiff advanced a new theory that, because at the time of negotiations with plaintiff defendant did not have funding to purchase and specific plans for plaintiff's west side properties, defendant's "threat" of condemnation exceeded its authority. Further, plaintiff argued that defendant abandoned its effort to acquire the west side properties, including the Abraham properties, and that such abandonment formed a basis for mutual mistake, failure of consideration, and innocent misrepresentation, all of which are grounds

for rescission of the option contract. Plaintiff argued that the property would now be worth $2.5 million dollars and that plaintiff was only asking for the opportunity to participate in the market.

On July 11, 2000, the trial court granted plaintiff's motion for partial summary disposition, concluding in its oral remarks from the bench that "[t]he awesome power of government should not be utilized to benefit one property owner over another property owner." In its written order, the court also stated that "it is not good policy for a governmental entity with powers of eminent domain to threaten condemnation if a sale of the property is not reached with the property owner, and to then borrow the money from another private entity developer in the area, and then to repay the loan by transferring the purchased property to the private entity developer who loaned the money."

I

Defendant first argues that the trial court erred in applying the requirements of subsections 5(4) and 5(5) of the Uniform Condemnation Procedures Act (UCPA), MCL 213.55(4) and (5), to a negotiated purchase of real property by a governmental agency having the authority to make such a purchase, and by concluding that defendant's failure to purchase or condemn other property formed a basis to rescind the sale of the subject property. A trial court's grant or denial of summary disposition is reviewed de novo on appeal. *Gen Motors Corp v Dep't of Treasury*, 466 Mich 231, 236; 644 NW2d 734 (2002). Similarly, the interpretation of contracts, *Morley v Automobile Club of Michigan*, 458 Mich 459, 465; 581 NW2d 237 (1998), and questions of statutory interpretation, *Detroit/*

*Wayne Co Stadium Auth v 7631 Lewiston, Inc,* 237 Mich App 43, 47; 601 NW2d 879 (1999), are reviewed de novo on appeal. Equitable actions, including actions to rescind a contract, are reviewed de novo, but the factual findings of the trial court are reviewed for clear error. MCR 2.613(C); *Lenawee Co Bd of Health v Messerly,* 417 Mich 17; 331 NW2d 203 (1982).

A

The trial court fundamentally erred in analyzing this case as involving a "taking," which occurs when the government appropriates private property or regulates it "too far." *Volkema v Dep't of Natural Resources,* 214 Mich App 66, 69; 542 NW2d 282 (1995). Neither category applies in the present case. Rather, the intent of the Legislature, found in the plain language of the statute, *Detroit/Wayne Co Stadium Auth, supra* at 47, makes it clear that the Legislature has vested in building authorities like defendant alternative means of purchase or condemnation to acquire property deemed necessary for public purposes. MCL 123.959 provides that for "the purpose of accomplishing the objects of its incorporation the authority may acquire property by purchase, construction, lease, gift, devise or condemnation." Plaintiff does not dispute that defendant is a duly created building authority vested by the Legislature with the power to purchase and, if necessary, to condemn property necessary for the public purpose of constructing stadiums, including acquiring sufficient parking space. Here, the parties never reached the condemnation stage, but, rather, engaged in purchase negotiations governed by subsection 5(1) of the UCPA,

MCL 213.55(1). Thus, the concept of "taking" was not implicated.

The trial court also erred in basing its grant of summary disposition on its conclusion that defendant did not have the present ability to condemn the subject property because it "did not have the funding available to purchase" and "did not have a plan in place to use" the subject properties in the stadium project. The requirements of MCL 213.55(4)(a), "[a] plan showing the property to be taken," and MCL 213.55(5), "[w]hen the complaint is filed, the agency shall deposit the amount estimated to be just compensation with [an escrow agent]," clearly only establish criteria for complaints to institute condemnation. As noted above, the parties never reached the condemnation stage, but, rather, engaged in purchase negotiations governed by MCL 213.55(1), which requires that the agency seeking the property must establish an appraisal of just compensation and make a good-faith offer not less than the agency's appraisal. *Detroit/Wayne Co Stadium Auth, supra* at 47-48. It is undisputed that defendant negotiated with plaintiff to purchase the subject property on the basis of appraisals it had obtained for the property in compliance with MCL 213.55(1) and, therefore, defendant's "present ability" to immediately file a condemnation complaint is immaterial.

Moreover, even if a taking were involved, the Tigers' involvement in the stadium project as both a beneficiary and a benefactor would not render the taking unlawful, provided that the public is primarily benefited. *Tolksdorf v Griffith*, 464 Mich 1, 9; 626 NW2d 163 (2001); *McDonald v Marquette Circuit Judge*, 159 Mich 367, 370-371; 123 NW 1112 (1909).

Plaintiff does not dispute that the acquisition of property for a stadium, and land for stadium parking, are permitted public purposes. Indeed, "the mere fact that the taking of property for a public use will result in greater benefit to some persons than to others, or that private individuals contribute to the expense of such a taking, does not affect the character of such use, or render it any the less public, within the meaning and scope of the law of eminent domain." *In re Condemnations for Improvement of River Rouge*, 266 F 105, 114 (ED Mich, 1920).

B

The trial court found as fact that consideration for the option contract included, inter alia, that defendant "explicitly represented that they were going to purchase the property owned by the Abrahams and Potestivos which adjoined the underlying property." The trial court also concluded that rescission of the sale of the subject property should be granted because of "failure of consideration due to [defendant's] failure to purchase the Abraham/Potestivo's west side properties." In essence, the trial court concluded that the option contract required defendant to purchase property described in term 3 of the option, which provided, "the per square foot price paid to Optioner for the property located on the Westside of Woodward shall be equal to the price per square foot paid by Optionee . . . to the owners of the Parcel located on Elizabeth and Park Avenue for the property located on Elizabeth and Park Avenue." The trial court erred in its interpretation of the option contract.

A contract must be construed in its entirety to determine the intent of the parties and give legal effect to it as a whole. *Perry v Sied*, 461 Mich 680, 689, n 10; 611 NW2d 516 (2000). Where the contract language is clear, its interpretation is a question of law. *Meagher v Wayne State Univ*, 222 Mich App 700, 721; 565 NW2d 401 (1997). Also, a contract must be interpreted and enforced according to its plain and ordinary meaning. *Id.* at 722. Here, the contract required plaintiff to convey by warranty deed twenty-three parcels of property upon payment by defendant of the sum of $6,459,100. While the contact provided that the price to be paid per square foot for the five west side parcels included in the contract shall be equal to the price per square foot paid by defendant for certain other property, nowhere does the contract require defendant to purchase the other property. The contract, read as a whole, plainly provided only that plaintiff would convey property to defendant upon payment of money and did not otherwise specify a separate price for any of the individual parcels of property.

It is undisputed that, at the time of closing, defendant had not purchased the property specified in term 3 of the option contract and, therefore, that property could not serve as a yardstick to determine the price of the west side properties included in the option. The parties were clearly aware of the paragraph in question at the time of closing and were aware that defendant had not purchased the yardstick property. If defendant was required to purchase the yardstick property, plaintiff waived that condition. See, generally, 17A Am Jur 2d, Contracts, §§ 658, 659, pp 665-666. Moreover, as a general rule a deed executed in

the performance of a contract for the sale of land operates as satisfaction and discharge of the terms of the purchase contract. *Chapdelaine v Sochocki*, 247 Mich App 167, 171; 635 NW2d 339 (2001). Here, the exception to the general rule does not apply because the alleged condition could have been fulfilled before delivery of the deed and plaintiff's conveyance of the subject property constituted full performance by her of the contract. Thus, to the extent the paragraph at issue was not satisfied, plaintiff's conveyance without a reservation of security for additional payment operated as a waiver and discharge of further performance by defendant.

II

Defendant argues that the trial court erred in making a factual finding directly contradictory to a previously stipulated fact adopted by the court. Defendant has abandoned this issue by failing to brief it in accord with the court rules and by failing to set out any argument or authority supporting its claim of error. MCR 7.212(C)(7); *Yee v Shiawassee Co Bd of Comm'rs*, 251 Mich App 379, 406; 651 NW2d 756 (2002).

III

Defendant contends that the trial court erred in granting summary disposition in favor of plaintiff on the basis of failure of consideration, mutual mistake, and innocent misrepresentation.

A. FAILURE OF CONSIDERATION

The trial court concluded that there was a failure of consideration for the option contract that warranted rescission of the contract because (1) defendant promised to pay plaintiff the same price per square foot it paid for the Abraham property, but never purchased the Abraham property and (2) plaintiff was induced to contract with defendant on the basis of a threat to acquire the property by eminent domain, which could not be commenced because defendant lacked funding to purchase and a plan for the property. We have already concluded that the latter reason is based on misapplication of requirements to institute a complaint for condemnation to the alternative means of acquiring property through good-faith negotiations. Furthermore, the trial court's reasoning is fundamentally flawed in that it misconstrued motive for negotiating as consideration. Consideration is a bargained-for exchange that requires "a benefit on one side, or a detriment suffered, or service done on the other." *Gen Motors, supra* at 239. The "threat of condemnation" simply does not meet this definition of a bargained-for exchange; rather, it was what motivated plaintiff to negotiate. *Rose v Lurvey,* 40 Mich App 230, 234-235; 198 NW2d 839 (1972). "Inducements and motives . . . are not that bargained for exchange or legal detriment to defendants which is necessary to establish a legally valid contract." *Id.* at 235.

"The motive which prompts one to enter into a contract and the consideration for the contract are distinct and different things. Parties are led into agreements by many inducements, such as the hope of profit, the expectation of acquiring what they could not otherwise obtain, the desire of avoiding a loss, etc. These inducements are not, how-

ever, either legal or equitable consideration, and actually
compose no part of the contract." [*Id.*, quoting 17 Am Jur
2d, Contracts, § 93, pp 436-437.]

The trial court correctly concluded that the Abra-
ham clause was bargained-for consideration. It is
undisputed that plaintiff feared that Abraham would
receive a better deal from defendant for his similarly
situated property because of perceived political clout
with the county administration, and that the clause at
issue was agreed to by defendant to placate plaintiff's
fears. Clearly this was a bargained-for detriment to
defendant, requiring defendant to pay plaintiff more
money if defendant paid Abraham a higher price per
square foot for his property, as well as a benefit to
plaintiff. However, as discussed above, the clause did
not obligate defendant to purchase the Abraham
property, nor did this consideration fail. Plaintiff bar-
gained for and received peace of mind that defendant
would not pay someone else more money than she
was paid for similar property. Like the bargained-for,
after-warranty goodwill policy in *Gen Motors Corp*,
*supra*, a bargained-for benefit flowed to plaintiff from
the clause regardless whether it resulted in plaintiff's
being paid more money.

The trial court's finding that the subject property
was purchased below market value is both unsup-
ported by evidence and legally without merit. By de-
position, defendant's representatives testified that
negotiations for the west side property were based on
appraisals. Plaintiff admitted that defendant had an
appraisal for the property and the appraisals attached
to defendant's brief are consistent with the purchase
price paid by defendant for the subject property.
Moreover, the parties' negotiations occurred at a

point before sufficient property had been acquired to assure that the major corporate players, the Lions and the Tigers, would not withdraw, and before the electorate had approved taxation to support the project. Plaintiff's estimates of property values are based on land sales after events occurred that assured the project would go forward and that apparently created an economic boom for the area. Moreover, this claim strays into the sufficiency of the consideration, which courts generally will not examine. *Gen Motors Corp*, *supra* at 239. " 'Mere inadequacy of consideration, unless it be so gross as to shock the conscience of the court, is not ground for rescission.' " *Rose, supra* at 234, quoting *Hake v Youngs*, 254 Mich 545, 550; 236 NW 858 (1931).

The undisputed evidence, viewed in the light most favorable to defendant, establishes that rescission of plaintiff's sale of the subject property is unwarranted. Plaintiff bargained at a time when the future of the stadium project was uncertain and assumed the risk that she may have been better off not voluntarily selling the subject property; rescission on these facts is unjustified. *Lenawee Co, supra* at 30.

### B. MUTUAL MISTAKE

Defendant maintains that the trial court erred in finding that two mutual mistakes of fact provided a basis to rescind the sale of the subject property. The court found that the parties mistakenly believed that (1) defendant could immediately condemn the property and (2) defendant would purchase the Abraham property. As already discussed, the assumptions underlying the first alleged mutual mistake concerning defendant's ability to employ eminent domain

amount to a misapplication of the statutory require-
ments for a condemnation complaint that are immate-
rial to good-faith negotiations to purchase property.
The ability of defendant to exercise eminent domain
was a motivating factor and was not a part of the
contract. *Rose, supra* at 234-235.

Further, the parties' belief at the time of negotiating
and entering into the option contract that defendant
would purchase or condemn all the west side proper-
ties, including the Abraham property, does not sup-
port rescission of the contract. This "fact" clearly
related to the occurrence or nonoccurrence of a
future event and, as such, cannot serve as a basis to
rescind because of mutual mistake. *Lenawee Co,
supra* at 24. Even assuming that defendant promised
to purchase the Abraham property, plaintiff waived
performance by delivery of a warranty deed for the
subject property in exchange for payment of money
recited in the deed.

### C. INNOCENT MISREPRESENTATION

Defendant contends that the trial court erred in
finding that an innocent misrepresentation warranted
rescission of the contract because no evidence sup-
ported a finding that defendant misrepresented any
fact resulting in unjust enrichment. The trial court
found that (1) defendant represented it would imme-
diately condemn the property if a purchase agreement
could not be reached, and (2) defendant represented
it would purchase the Abraham property.

Michigan recognizes the doctrine of "innocent mis-
representation" in the making of a contract whereby a
false statement of fact, made without knowledge of

its falsity or intent to deceive, is actionable if relied upon by the other party to the contract to their detriment and the party that made the false statement is unjustly enriched. *United States Fidelity & Guaranty Co v Black*, 412 Mich 99, 115-118; 313 NW2d 77 (1981). As with mutual mistake and intentional fraud, the misrepresentation must relate to a past or existing fact and not be promissory in nature. *Forge v Smith*, 458 Mich 198, 212; 580 NW2d 876 (1998). See also *Hi-Way Motor Co v Int'l Harvester Co*, 398 Mich 330, 336; 247 NW2d 813 (1976). In this case, no evidence existed that defendant misrepresented its intent to purchase or condemn the west side property for the stadium project. Plaintiff's legal theory in this regard, adopted by the trial court, is erroneous as previously discussed. There can be no fraudulent or innocent misrepresentation without a false statement. *Hord v Environmental Research Institute (After Remand)*, 463 Mich 399, 410; 617 NW2d 543 (2000).

Further, the record does not support the conclusion that plaintiff relied on defendant's ability to immediately institute condemnation proceedings. Rather, it is undisputed that plaintiff was well aware at the time of negotiations that it was uncertain the stadium project would ever actually materialize. Specifically, plaintiff was aware defendant had to acquire the rights to sufficient property to convince the Lions and the Tigers that the project was financially feasible, and the electorate had to approve a tax supporting the project in the November election. With regard to the alleged promise to purchase the Abraham property, it was known at the time plaintiff delivered the deed to the subject property that defendant had not purchased the Abraham property and her conveyance

without reservation waived any future claim in that regard. A claim of innocent misrepresentation cannot be supported on a promise of future performance and cannot be supported without proof of detrimental reliance. *Forge, supra* at 212.

Furthermore, plaintiff's claim that she was misled concerning the Detroit Tigers is without merit. The intimate involvement of the Tigers in the stadium project, including providing a substantial financial contribution to building a stadium for the Tigers as their home field, and holding the concession for project parking, was a matter of public record. See, e.g., *Forge, supra* at 212, and *McMullen v Joldersma*, 174 Mich App 207, 213-214; 435 NW2d 428 (1988). The record discloses that plaintiff was very experienced in real estate transactions and also represented by counsel during negotiations. The record also establishes that the Tigers' loan to purchase the subject property was consistent with the memorandum of understanding between the stadium project principals, a public record, and was disclosed at the time to plaintiff. Thus, any belief on plaintiff's part that the Tigers were not intimately involved in the stadium project, as well as stadium parking, was an unjustified inference that will not support a claim of misrepresentation. *Hord, supra* at 410.

Finally, the trial court's order provided:

> The Court further finds that it is not good policy for a governmental entity with powers of eminent domain to threaten condemnation if a sale of the property is not reached with the property owner, and to then borrow the money from another private entity developer in the area, and then to repay the loan by transferring the purchased property to the private entity developer who loaned the money.

We assume that the trial court's reference to "good policy" referred to "public policy," and not the trial court's own personal opinion. Our Supreme Court recently addressed the source of "pubic policy" in *Terrien v Zwit*, 467 Mich 56, 66; 648 NW2d 602 (2002), opining "it is clear to us that this term must be more than a different nomenclature for describing the personal preferences of individual judges, for the proper exercise of the judicial power is to determine from objective legal sources what public policy is, and not to simply assert what such policy ought to be on the basis of the subjective views of individual judges." It is without question the public policy of this state and of the United States as expressed in both the state and federal constitutions that private property may not be taken by the government without just compensation, and then only in accordance with due process and for public purposes. *Tolksdorf, supra* at 2, 7-9; *Attorney Gen v Pub Service Comm*, 249 Mich App 424, 435; 642 NW2d 691 (2002). The record in this case discloses no evidence that defendant did anything other than pursue the public purposes of acquiring property to build stadiums and operating necessary parking facilities. MCL 123.951. Although the subsequent transfer of the subject property to the Tigers after defendant decided to "downsize" the project may "raise eyebrows," the trial court has cited no legal authority for the proposition that a private entity that will be both a major beneficiary and a benefactor of the project may not assist its funding or be a transferee of property no longer deemed necessary.[2]

---

[2] This is not to suggest that legal or equitable remedies would not be available upon presentation of evidence that the original transaction was a sham or intentionally fraudulent. However, the trial court did not find

Neither the evidence nor the law supports the trial court's determination that failure of consideration, mutual mistake, or innocent misrepresentation warranted rescission of the sale of the subject property. Because there are no material facts in dispute, we conclude that defendant, rather than plaintiff, was entitled to judgment as a matter of law. MCR 2.116(I)(2), MCR 7.216(A).[3]

Reversed.

---

intentional fraud and review de novo of the record reveals no evidence of fraud.

[3] In light of our resolution of this case, we need not address the remaining issues raised by defendant.