## HAMILTON *v.* WICKSON.[1]

1. TITLE TO LANDS — RESULTING TRUSTS — CONSIDERATION FURNISHED BY THIRD PERSON.

   No trust results in favor of a person furnishing the consideration for land the title to which, with his consent, is taken in the name of another. 3 Comp. Laws, §§ 8835, 8837.

2. SAME—EVIDENCE OF OWNERSHIP.

   The expenditure of money in making improvements on land by the holder of the legal title is some evidence tending to show that he is the beneficial owner.

[1] Rehearing denied October 18, 1902.

3. SAME—ACCEPTANCE OF LEASE.
    The acceptance of a life lease of land, containing a provision
    for re-entry for breach of condition, is a recognition by the
    lessee that the lessor is the true owner.

4. SAME.
    And declarations by the lessor that the land is to belong to the
    children of the lessee after the latter's death do not tend to
    break the force of such recognition.

5. SAME—ADVERSE POSSESSION—LIFE TENANT.
    The possession of a life tenant cannot be adverse to the re-
    mainder-man.

Appeal from Montcalm; Davis, J.   Submitted October
10, 1901.   (Docket No. 35.)   Decided June 17, 1902.

Bill by Adah Hamilton and others against Paul G.
Wickson and others to quiet title.   From a decree for
complainants, defendants appeal.   Reversed.

*N. O. Griswold*, for complainants.

*Lemuel & William K. Clute*, for defendants.

MONTGOMERY, J.   The complainants are respectively
the widow and children of John Hamilton, deceased.   The
defendants are executors of the will of Norman Hamilton.
John and Norman Hamilton were brothers.   In 1847 a
patent was issued to Norman Hamilton for 80 acres of
land in Montcalm county, and in 1856 the title to an
adjoining 40 was vested in Norman by deed of conveyance
from Daniel Swift.   The 80 was, of course, wholly unim-
proved when title was acquired from the government,
and the 40 purchased from Swift was but partially
improved when purchased.   John Hamilton, with his
wife and family, went upon the land soon after its pur-
chase, and continued to occupy it up to the time of his
death, in 1891.   The terms under which he occupied are
the subject of this controversy.   In May, 1870, Norman
visited the home of John at the premises in question, and
at that time a life lease was executed to John and his wife,

Adah, which continued the estate to the survivor for life. The rent reserved was nominal ($1 per year). The lease contained a forfeiture clause as follows:

"And it is expressly understood, declared, and agreed by and between the parties hereto, and these presents are made upon the express condition, that the term hereby created shall not in any case be assignable by the said parties of the second part, or either of them, or by the survivor of them, nor shall the same be taken in execution, or be mortgaged, pledged, or in any way aliened; and that in the event of the said term hereby granted and created, or the said demised premises, being assigned, mortgaged, pledged, or in any way aliened, sold, or taken in execution, or the said parties of the second part, or either of them, or the survivor of them, becoming bankrupt or insolvent, or in case of the nonperformance of the covenants aforesaid, that then, in either or any of such case or cases, the said term or estate hereby created or intended so to be shall immediately cease and determine, and these presents become void, and the said demised premises at once revert to the said party of the first part, his heirs, executors, administrators, or assigns, and he or they be thereupon at liberty to enter upon said demised premises, either with or without formal demand for possession thereof, and the same to have again as of his or their forever estate, notwithstanding the said parties of the second part, or the survivor of them, may still be alive, anything herein contained to the contrary notwithstanding."

Norman Hamilton died in 1874, leaving a will, which contained the following provisions:

"The farm and lands of which my brother John and his wife, Adah, hold a life lease from me, after the decease of the survivor of them, I give and devise to the then living sons of my said brother John equally, share and share alike. * * * But I hereby declare and direct that the said above-mentioned devises of my said lands in the said State of Michigan shall not take effect until after the decease of my said daughter without lawful issue; nor shall such devises prevent or be a bar to my said executors and trustees, or the survivor or survivors, successor or successors, of them, from selling, disposing of, and conveying all of my said lands in the State of Michigan of which my said brothers, John, Ezra, and William, and their respective wives, do not hold life leases from me."

The daughter referred to is still living, and has issue. In 1888, John Hamilton and wife gave a deed of a 50-foot strip of the land to the Toledo, Saginaw & Muskegon Railway Company for a railroad. The executors, claiming that the covenant to keep in repair and the condition against alienation had been broken, gave notice of the termination of the tenancy, and instituted an action in ejectment. Complainants thereupon filed this bill to stay proceedings in ejectment. The bill recites the facts above set up, and avers that the consideration for the purchase of the land originally was furnished by John, and that Norman held the land solely in trust for John and his family, and never had any equitable interest therein. As to the life lease, the bill avers:

"Your oratrix and orators further show unto the court that on the 25th day of May, in the year 1870, the said Norman Hamilton visited the said John Hamilton at his said home in Fairplains, as he had frequently done before, and then proposed, during the course of their visit, that he would secure to your oratrix, Adah Hamilton, a life estate in said lands if she should survive the said John Hamilton, but would hold the title of such lands in such shape that the said John Hamilton could not, under any circumstances, incumber or convey the same, so as to make your oratrix absolutely certain that she would have a home on said lands, and a right to the use of the same, during the years that she might survive the said John Hamilton; that your oratrix was anxious to be made as safe in such event as possible, for the reason that she had then, and has had ever since, the personal charge and burden of maintaining the said John Milton Hamilton, her son, as aforesaid; and having full faith and confidence in the said Norman Hamilton, and believing that whatever measure he suggested would be wise and prudent, and would be carried out by him in perfect good faith, she accepted the proposition then made by the said Norman Hamilton, to the effect that the said Norman Hamilton should execute to the said John Hamilton and your oratrix, Adah Hamilton, jointly, a life lease of said lands, reserving to the said Norman Hamilton one dollar per year as the rent therefor; and that such life lease was then and there executed, at the request of the said Norman Hamilton, and

by him signed, and signed also by the said John Hamilton and your oratrix, but was never acknowledged as a conveyance, and has ever since then been in the possession of your oratrix.

"Your oratrix and orators further show that neither said John Hamilton nor your oratrix understood or supposed or believed that the papers so executed could or would be used at any time in the future as evidence of the ownership of said Norman Hamilton in the lands first above described, or that it would have that effect, or hinder or embarrass them in any way; and were assured over and over again by the said Norman Hamilton, at the time it was made, that said life lease would not change their relationship or affect the rights of any one in any way whatever, except to secure to your oratrix the entire right to use and keep said lands for the years that she might survive the said John Hamilton, and that, if she was thus secured, then the said John Hamilton could not, in any way, by will or otherwise, deprive your oratrix of such exclusive use of said lands during such period; and were repeatedly assured by said Norman Hamilton that said lands were theirs and their sons' after them, but he wanted only to protect your oratrix and her sons from any profligacy or mischance on the part of said John Hamilton."

The bill also sets up adverse possession. The defendants answered, denying adverse possession, alleging title in the executors, asserting the breach of the conditions of the lease, and praying a decree quieting title. The circuit judge gave a decree for complainants, and defendants appeal.

It is clear that the claim that a trust was created by the original conveyance to Norman cannot be maintained. The statute (3 Comp. Laws, § 8835) expressly declares that when a grant for a valuable consideration shall be made to one person, and the consideration therefor shall be paid by another, no use or trust shall result in favor of the person by whom such payment shall be made, but the title shall vest in the alienee in such conveyance, subject only to the provisions of the next section, which relates to creditors. No case could be imagined in which the rule of this section could have more direct application. And

the case also illustrates the wisdom of the enactment. After the lapse of all these years, a feeble attempt is made to impress a trust upon these lands by testimony tending to show that the consideration was furnished by John Hamilton. It is possible that on this record, and in the absence of the evidence afforded by the life lease, the force of which will be hereinafter referred to, there may be a slight preponderance in favor of this claim. But the lips of Norman Hamilton are sealed in death. The statute was enacted to meet such a case. It should be added that Norman Hamilton is shown to have expended some money to assist in making improvements on the land, which is some testimony, in addition to the fact that the title stood in him, to show him the beneficial owner. The most important fact in the case, however, is the execution of the life lease in 1870. This is, in terms, a plain, unequivocal recognition of Norman Hamilton as the true owner. Nor are we impressed with the effort to render this valueless by parol testimony. Its terms are unambiguous, it appears to have been made upon full consideration, and the declarations of Norman that the farm was to belong to John's children after his death, if made, import no more than that he intended to convey the remainder to them, by will or otherwise. Certainly all parties must have understood that he had not done so by the lease. There is no evidence to sustain a charge of fraud in securing the execution of the lease.

There was no adverse possession. The relations of the parties preclude this claim. 1 Am. & Eng. Enc. Law (2d Ed.), p. 807.

It seems not to be contested that, if the lease is a subsisting, binding agreement, its covenants have been broken in such manner as to entitle the remainder-men to re-enter.

It follows that the decree must be reversed, and a decree entered here for defendants, with costs of both courts.

HOOKER, C. J., MOORE and GRANT, JJ., concurred. LONG, J., did not sit.