MAJESTIC GOLF, LLC v LAKE WALDEN COUNTRY CLUB, INC

Docket No. 300140. Submitted December 7, 2011, at Lansing. Decided July 10, 2012, at 9:00 a.m. Leave to appeal granted, 493 Mich 958.

Majestic Golf, LLC, filed an action in the Livingston Circuit Court against Lake Walden Country Club, Inc., seeking to enforce a forfeiture clause in the parties' commercial real-estate lease. Plaintiff (as the successor in interest of Waldenwoods Properties, LLC, the original owner and developer of the property in issue) developed a plan to build a golf course surrounded by a residential development on land it owned. In 1992, plaintiff (as landlord) and defendant (as tenant) entered into a 25-year lease agreement that required defendant to pay rent to plaintiff for use of the underlying land on which defendant would construct a 27-hole golf course and plaintiff would develop the surrounding land into residential real estate. Defendant built and operated the golf course, but plaintiff never started construction on the residential development. The parties began merger negotiations in March 2003 that continued until the present litigation. The contract required defendant to consent to roadway-crossing easements to accommodate the proposed residential development. Beginning in 2006, plaintiff notified defendant of its need for defendant to grant the road-crossing easements. Plaintiff sent a letter to defendant on October 7, 2008, detailing defendant's obligations under the lease regarding the road-crossing easements and requesting that defendant fulfill its obligations by signing and returning the consent of grant of easement within 30 days. Plaintiff's attorney sent a letter to defendant on November 24, 2008, stating that defendant's continued failure to execute the consent to the grant of easements constituted a default under the terms of the contract and exercising plaintiff's right to terminate the lease effective immediately. On December 11, 2008, defendant indicated that it would treat the November letter as the required 30-day notice to terminate the lease. On December 22, 2008, defendant's attorney informed plaintiff by letter that defendant was exercising its option under the lease to purchase the golf course property and this action ensued. Both parties moved for summary disposition, which the court, Michael P. Hatty, J., granted in part and denied in part, holding that defendant defaulted under the terms of the lease

because it failed to agree to the requested easements and that the October 7, 2008, letter constituted the requisite notice that defendant had not fulfilled its obligations under the lease. The court refused to enforce the forfeiture clause of the lease, however, concluding that it would be inequitable to terminate the lease because the breach was not material. Plaintiff appealed and defendant cross-appealed.

The Court of Appeals *held*:

1. A contract must be interpreted according to its plain and ordinary meaning. When contractual language is unambiguous it must be enforced as written unless it violates the law, is contrary to public policy, or is unenforceable under traditional contract defenses. The lease was unambiguous and provided that plaintiff could cancel and terminate the lease if defendant failed to comply with any obligation (other than the payment of rent) and the failure to perform continued for 30 days after defendant was formally notified of the failure to perform. Plaintiff's October 7, 2008, letter notified defendant of its obligation under the lease to grant the road-crossing easements and that it had 30 days to cure its nonperformance. The court properly determined that defendant breached the lease when it failed to agree to the easements as required by the terms of the lease.

2. A court may not ignore a contract's plain and unambiguous terms on the basis that they are unreasonable. Rescission is an equitable remedy that is used to terminate a contract and places the parties in their original position, even if restitution is necessary. In contrast, forfeiture is that which is lost, or the right to which is alienated, by a breach of contract and terminates an existing contract without restitution. The breach of a covenant does not justify the cancellation of an entire contract unless there is a provision in a contract clearly and expressly allowing forfeiture. Only recognized traditional contract defenses, like duress, waiver, estoppel, fraud, and unconscionability may be used to avoid the enforcement of a legal forfeiture clause. Procedural and substantive unconscionability must be present for a contract or a contract provision to be found unconscionable. Procedural unconscionability occurs when the weaker party was not free to accept or reject the disputed contract term. A contract provision is substantively unconscionable when its inequity is so extreme that is shocks the conscience. The court erred by ignoring the clear and unambiguous forfeiture clause by reforming the contract to include the term "material breach." The equitable remedy of rescission was not applicable to this case because the lease provided that it could be terminated if defendant failed to fulfill any of the

requisite lease obligations. Exceptional circumstances did not exist that would justify ignoring the plain language of the lease. The forfeiture clause did not violate the law and it was not contrary to public policy. In addition, the forfeiture clause was not avoidable under the unconscionability doctrine because it was neither procedurally nor substantively unconscionable. There was no evidence that defendant was in a weaker position than plaintiff and had been forced to accept the forfeiture term. The advantage given to plaintiff by the contract did not shock the conscience. The lease gave defendant 30 days to cure any breach before the lease would be terminated and under these circumstances the clause was not substantively unreasonable.

3. Plaintiff successfully invoked the default provision of the contract and terminated the lease on November 24, 2008. Because plaintiff's termination of the lease extinguished defendant's option to purchase the land on which the golf course was developed, defendant's attempt to exercise the Lease's option-to-purchase provision on December 22, 2008, was void. The court's decision would not be reversed because it reached this same result but for the wrong reason.

4. Defendant was not excused from its obligation to consent to the easement agreement. There was no evidence that its refusal to consent was based on an objection to the location of the proposed easements and its failure to consent was a breach of the plain and unambiguous terms of the lease. There was no evidence to support defendant's assertion that its consent to the road easement was not required because it was contingent on finalization of the merger agreement or it was not ripe because certain unwritten conditions had not been met.

5. The October 7, 2008, letter satisfied the notice requirements of the lease. The record did not support defendant's claim that the letter was not sent via registered mail. The lease did not require written notice to contain specific words, the letter referred to defendant's continuing obligation under the lease to provide the consent and established a 30-day time period to cure the defect, which matches the time period requirement set forth in the forfeiture clause.

Affirmed in part, reversed in part, and remanded for further proceedings.

CONTRACTS — BREACH OF CONTRACTS — FORFEITURE — AVOIDANCE OF FORFEITURE — UNCONSCIONABLE.

A court may not ignore a contract's plain and unambiguous terms on the basis that they are unreasonable; forfeiture is that which is

lost, or the right to which is alienated, by a breach of contract and terminates an existing contract without restitution; breach of a covenant does not justify the cancellation of an entire contract unless there is a provision in a contract clearly and expressly allowing forfeiture; only recognized traditional contract defenses, like duress, waiver, estoppel, fraud, and unconscionability may be used to avoid the enforcement of a legal forfeiture clause; procedural and substantive unconscionability must both be present for a contract or a contract provision to be found unconscionable; procedural unconscionability occurs when the weaker party was not free to accept or reject the disputed contract term; a contract provision is substantively unconscionable when its inequity is so extreme that is shocks the conscience.

*Fraser Trebilcock Davis & Dunlap, P.C.* (by *Graham K. Crabtree* and *Thaddeus E. Morgan*), for Majestic Golf, LLC.

*McClelland & Anderson, LLP* (by *Gregory L. McLelland* and *Melissa A. Hagen*), for Lake Walden Country Club, Inc.

Before: WILDER, P.J., and TALBOT and SERVITTO, JJ.

WILDER, P.J. In this case involving a commercial real-estate contractual relationship, plaintiff, Majestic Golf LLC, appeals as of right from an opinion and order granting it summary disposition in part and denying it summary disposition in part. Defendant, Lake Walden Country Club, Inc., cross-appeals as of right from the same order. We affirm in part, reverse in part, and remand.

## I. BASIC FACTS

In 1991, Waldenwoods Properties, L.L.C. (WPL) started planning for a "golf course-real estate development" on approximately 1,400 acres of land it owned. As planned, the golf course was to be constructed on approximately 400 acres, and residential properties

were going to surround the golf course. WPL planned to lease the land for the golf course ("the Golf Property" or "the Premises") to a different entity that would be responsible for constructing and operating the golf course.

On December 8, 1992, WPL (as landlord) and defendant (as tenant) entered into a lease agreement (the Lease) for a period of 25 years. The Lease contained the following relevant paragraphs:

**17. OPTION TO PURCHASE.** Tenant is hereby granted an exclusive option to purchase the Premises on the following terms and conditions:

A. The option shall be exercisable at any time during the final ten (10) years of the Lease term, excluding however the final six (6) months.

B. Exercise of the option shall be in writing, delivered to Landlord.

C. The option may be exercised only if Tenant is not in default of this Lease at the time of exercise.

D. The price shall be determined by appraisal of the fair market value of the Premises as of the date of exercise of the option, but in the condition and state they are in as of the date of executing this Lease, with the assumption they are not subject to this Lease and are restricted to golf course use.

\* \* \*

H. Each party at its own expense shall retain an appraiser within thirty (30) days after the option is exercised. Within ninety (90) days after the option is exercised, the parties shall exchange appraisals. If the higher is no more than Ten Percent (10%) higher than the lower, the average of the two (2) shall be the purchase price. If the higher is more than Ten Percent (10%) higher than the lower, the two appraisers within thirty (30) days shall select a third appraiser who shall review the two (2)

appraisals and within an additional (30) days determine the purchase price, which shall be no less than the lower appraisal and no higher than the higher appraisal. The cost of the third appraiser shall be borne equally by the parties.

\* \* \*

K. If this Lease terminates for any reason prior to Tenant exercising its option to purchase, the option shall automatically terminate on termination of the Lease.

\* \* \*

**22. LANDLORD'S EASEMENTS AND ROAD CROSSINGS.** Tenant shall permit drainage and utility easements and road crossings to be developed by Landlord on the Premises as required to permit development to occur on Landlord's Other Real Estate. The easements and crossings shall be installed by Landlord at its expense but located in areas mutually agreeable. The utilities and roads shall be installed in such a manner as to ensure that the integrity of the golf course in [sic] preserved, leaving the golf course in equal or better condition.

\* \* \*

**26. DEFAULT.** Each of the following events shall be a default hereunder by Tenant and a breach of this Lease.

\* \* \*

D. If Tenant shall fail to perform any of the agreements, terms, covenants, or conditions hereof on Tenant's part to be performed (other than payment of rent) and such non-performance shall continue for a period within which performance is required to be made by specific provision of this Lease, or if no such period is so provided for, a period of thirty (30) days after notice thereof by Landlord to Tenant, or if such performance cannot be reasonably had within such thirty (30) day period, Tenant shall not in good

faith have commenced such performance within such thirty (30) day period and shall not diligently proceed therewith to completion;

\* \* \*

If any event specified above shall occur and be continuing, Landlord shall have the right to cancel and terminate this Lease, as well as all of the right, title and interest of Tenant hereunder.

\* \* \*

**31. NOTICES.** Whenever it is provided herein that notice, demand, request, or other communication shall or may be given to or served upon either of the parties by the other, and whenever either of the parties shall desire to give or serve upon the other any notice, demand, request, or other communication with respect hereto or with respect to the Premises, each such notice, demand, request, or other communication shall be in writing and, any law or statute to the contrary notwithstanding, shall be effective for any purpose if given or served as follows:

A. If by Landlord, by mailing the same to Tenant by registered mail, postage prepaid, return receipt requested, addressed to Tenant at 4662 Okemos Road, Okemos, Michigan 48864, or at such other address as Tenant may from time to time designate by notice given to Landlord by registered mail.

At the time the Lease was originally signed, both parties anticipated the construction of the "golf-real estate development." Defendant was to develop the then-undeveloped Golf Property into 27 golf course holes, and WPL was to develop the surrounding land into residential real estate.

Defendant complied with its obligation under the Lease to construct the 27-hole golf course. Plaintiff has not yet initiated construction on the residential real

estate. Defendant had paid rent in a timely manner and fully complied with its other obligations under the Lease until the instant litigation commenced.

According to defendant, it has invested more than $6 million in the Golf Property and has paid over $1.6 million in rent to plaintiff. According to Frank Crouse, a manager of both WPL and plaintiff, defendant recovered its investment in the Golf Property within the first six years.

In March 2003, defendant and WPL (later, plaintiff, as WPL's successor in interest), began merger negotiations. In the potential merger, defendant was to transfer all of its interest in the Golf Property to plaintiff in exchange for an 85 percent membership interest in plaintiff. These merger negotiations continued until the present litigation began.

On October 27, 2006, Crouse (as manager of WPL) sent a letter to Pat Hayes, defendant's president. In this letter, he discussed the status of the ongoing merger negotiations and also discussed the status of the zoning approval process for WPL's "Master Plan" for development. He listed six necessary points of agreement for a successful merger and approval of the Master Plan. The fifth point of agreement required defendant's approval of a "road easement" between holes #21 and #22 (the Road Easement). WPL needed defendant's approval of the Road Easement to obtain Hartland Township's final approval of WPN's Master Plan.

On April 3, 2007, WPL conveyed title to the Golf Property to plaintiff,[1] thereby making plaintiff the successor in interest to WPL's interest in the Golf Property. But WPL continued to own the land surrounding the Golf Property. On April 26, 2007, plaintiff

---

[1] WPL is the only member of plaintiff.

presented to defendant a document titled "Consent to Grant of Easements." This "Consent" document was styled as a formal contract, and it included detailed maps and descriptions of the Road Easement.

On June 1, 2007, Crouse met with defendant's representatives to discuss the proposed merger and proposed Master Plan. According to the summary of the meeting, defendant reviewed plaintiff's proposed Road Easement and suggested certain changes. According to Crouse, none of defendant's suggested changes addressed the Road Easement's location.

On June 19, 2007, Crouse sent an e-mail to James Hile (a representative of defendant). The e-mail stated that Doug Austin would make "the appropriate changes previously agreed to" for the Road Easement. Crouse reminded Hile that defendant's consent to the Road Easement was necessary for approval of the Master Plan.

According to Crouse, a revised version of the Road Easement was delivered to defendant on November 5, 2007, for defendant's consent. According to Crouse, the revised version incorporated some of defendant's recommended changes to the Road Easement, although the location of the easement remained the same.

The discussions between plaintiff and defendant continued and finally culminated in a letter dated October 7, 2008, from Crouse to Hayes that read as follows:

> I am writing on behalf of both Waldenwoods Properties, LLC [WPL] and Majestic Golf, LLC to request that you execute the Consent portion of the enclosed Grant of Easement and return it to me for recording. As you will recall, Section 22 of the golf course lease obligates Lake Walden to permit road crossing easements when required by Waldenwoods for development of its adjoining land. Sometime ago Waldenwoods requested a crossing easement

from Majestic Golf, which owns the golf course land. Majestic Golf approved the request, and on that basis a proposed easement between Majestic and Waldenwoods was sent to Lake Walden on April 26, 2007 for review and consent.

Following receipt and review of the document, you requested some changes. Those were made, and the document was resubmitted to golf course management with a request to execute the Consent. This occurred, I believe, late in 2007. Despite the request, the written Consent has not been received. Concurrence by Lake Walden is urgently required.

I am requesting that Lake Walden fulfill its obligation under the lease. Please sign and return the enclosed Consent within thirty (30) days.

The next day, on October 8, 2008, Crouse sent an e-mail to both Hile and Hayes, which stated in relevant part:

While we still very much hope that a cooperative merger will take place, we have found it necessary to prepare for the circumstance that it may not, because the differences are found to be irreconcilable. . . .

If an agreement cannot be reached, then we may be presented with a notice by Lake Walden of its intent to exercise the purchase option included in our lease. Accordingly, we are providing the following attachments.

* * *

**Attachment 2 - A letter requesting Concurrence by Lake Walden in the crossing easement**, that has been in process since early 2007. The crossing easement has not changed – hence the legal descriptions finalized by Desine Inc.[ ]are dated 3/9/2007. We received approval subject to modifications to meet certain LWCC objections, and have previously asked for your concurrence, which has not be[en] provided as is required by Section 22 of the Lease. Failure to obtain Lake Walden concurrence was a major

reason why we were not able to finalize a Master Plan for our property. Now we again request that Lake Walden promptly fulfill its obligation under the lease.

\* \* \*

*We do not intend any of these items to be interpreted that we do not wish to successfully conclude a merger* – as you recall, it is WPL that has attempted to have this matter continue to receive consideration. *We are still hopeful that this process will be successful.*

According to Crouse, on November 10, 2008, defendant presented plaintiff with defendant's revised merger documents. These documents continued to claim that consent to the Road Easement was contingent upon finalization of the merger. Crouse stated that these documents were unreasonably one-sided in favor of defendant.

On November 24, 2008, legal counsel for plaintiff sent a letter to defendant that stated in relevant part:

The refusal of Lake Walden Country Club, Inc. to execute and deliver the Consent to the Grant of Easements sent to you on October 6, 2008 [sic — October 7, 2008] constitutes a default under the provisions of Paragraph 26 D of the Lease. On account of this default, Majestic Golf, LLC is hereby exercising its right under Paragraph 26 to terminate the Lease, effective immediately. Because of this termination, all rights granted to Lake Walden Country Club, Inc. to purchase the property pursuant to Paragraph 17 K of the Lease are also terminated, effective immediately.

On December 11, 2008, counsel for defendant sent a responding letter to plaintiff. Defendant's counsel stated that it was always the parties' intent to execute the Road Easement at the merger closing. He further stated that defendant was interpreting the November 24, 2008, letter as the formal 30-day notice required

under the Lease. He included defendant's revised version of the Grant of Easement and concluded by stating that defendant would agree to the new terms of the Grant of Easement to comply with the Lease. The revised documents were unsigned. In fact, defendant never signed any document to consent to plaintiff's Road Easement.

On December 22, 2008, counsel for defendant sent another letter to plaintiff, informing plaintiff that defendant was exercising its option to purchase the Golf Property under ¶ 17 of the Lease. Defendant stressed that under the terms of the Lease each party must obtain an appraisal. The parties both procured appraisals. Plaintiff's appraisal value of the Golf Property was $800,000, and defendant's effective market value of the Golf Property was zero dollars.[2]

Plaintiff filed its first amended complaint on May 21, 2009. Count I sought specific performance of ¶ 29 of the Lease, which required defendant to vacate the Golf Property upon termination of the Lease. Count II sought a declaratory order stating that defendant's attempt to exercise the option to purchase under ¶ 17 of the Lease was invalid because the Lease had terminated before defendant's attempt to exercise the option. Count III sought a stay of the 90-day appraisal period stated in ¶ 17 of the Lease, pending the trial court's resolution of the other issues of the case. Count IV sought a declaratory judgment and order for payment for defendant's reasonable rental value of the Golf Property during the case. Count V sought a declaratory judgment that defendant's option to purchase was void because defendant's appraisal of zero dollars was submitted in bad faith.

---

[2] Defendant explains that this value was derived using the appraisal instructions in the Lease.

Defendant filed its counterclaim on June 26, 2009. Count I sought specific performance of the appraisal and option to purchase provisions of ¶ 17 of the Lease. Count II sought a declaratory order stating that (1) defendant did not breach the Lease, and (2) defendant properly exercised the option to purchase on December 22, 2008.

Defendant moved for summary disposition under both MCR 2.116(C)(8) and MCR 2.116(C)(10) on August 27, 2009. Plaintiff, without citing a court rule, countered by moving for summary disposition on September 24, 2009.

The trial court, while applying only MCR 2.116(C)(10), issued its opinion and order on December 23, 2009. It identified three issues:

> The first issue is whether or not [defendant] defaulted on the lease after receiving notice of non-compliance with an obligation and an opportunity to cure that non-compliance via the Crouse letter on October 7, 2008. The second is whether, if [defendant] defaulted, such default warranted termination of the lease and, by extension, termination of their option to purchase the subject property. The final issue is whether, if [defendant] did properly invoke its option, either or both of the appraisals should be stricken by the Court as failing to comply with the appraisal procedures defined by ¶ 17(D) of the lease.

The trial court first held that defendant defaulted under the terms of the Lease. It explained that ¶ 22 of the Lease obligated defendant to agree to the requested easements. It further explained that the October 7, 2008, letter provided the requisite notice under ¶ 26 of the Lease, stating:

> It is inconsequential that the October 7 letter did not call itself notice or reference an existing default. As the plaintiff argues, a default did not exist until after 30 days of

non-performance following the transmission of this letter. Further, the terms of the lease do not require that the notice label itself as such but require only that the landlord inform the tenant that it has not performed an obligation under the lease, which this letter did. The October 8 e-mail from Crouse to Pat Hayes and James Hile does not contextualize away the sufficiency of this notice either but rather bolsters it. Although Crouse does express a desire to continue the negotiations, he also recites in the e-mail the defendant had not fulfilled its obligation under ¶ 22 of the lease and reiterates his request that the defendant do so. Finally, the allegation that the parties had agreed to another period for performance of this consent to easement is similarly immaterial. The obligation to permit easements is stated in mandatory language, and the time of performance is only contingent upon a mutually agreeable location being chosen. The lease itself under ¶ 43 limits modification of its terms by requiring a written instrument executed by both parties. Therefore, what the parties agreed orally as to when performance would occur was irrelevant since the plaintiff had a right to demand performance under the lease.

The trial court held that, because defendant did not provide its consent to the requested easements within 30 days of receiving the October 8 letter, defendant breached the Lease.

The trial court then held that termination of the Lease was not proper under principles of equity. The trial court concluded that termination was not warranted because defendant's breach was not material. It reasoned that defendant had invested over $6 million in the Golf Property and had paid its rent in a timely manner. The trial court also reasoned that any wrongful withholding of consent to the easement would be compensable in money damages. Thus, the trial court concluded that forfeiture of the Lease would be "unduly harsh and oppressive."

The trial court declined to address the third issue. It noted that defendant did not properly exercise the option under ¶ 17 because it breached the Lease before its attempt to exercise the option. The trial court concluded its opinion as follows:

> 1. As to Count I of the plaintiff's complaint seeking an order that the defendant surrender the lease premises, the defendant's motion for summary disposition is GRANTED. Because there is no genuine issue of material fact and the defendant's breach was not material, the plaintiff cannot succeed on that claim.
>
> 2. With respect to Count II of the plaintiff's complaint, the plaintiff's motion for summary disposition is GRANTED in part since the defendant's attempt to exercise their option to purchase was ineffective as a result of the defendant's default. However, because the defendant's breach was not material, the option has not indefinitely lapsed.
>
> 3. Consistent with this ruling, summary disposition is GRANTED in favor of defendant as to Count V of plaintiff's complaint and in favor of plaintiff as to Count I of the defendant's counter-complaint.
>
> 4. Finally, with respect to Counts III and IV of the plaintiff's complaint, the defendant's motion is DENIED. Count III was previously disposed of by the Court in issuing a preliminary injunction, and Count IV is not germane to the instant motion.

On January 22, 2010, plaintiff moved for reconsideration. Plaintiff urged the trial court to reconsider its holding that equitable considerations prohibited plaintiff from terminating the Lease. Plaintiff also urged the trial court, as a procedural matter, to dismiss count IV of plaintiff's first amended complaint without prejudice. On March 31, 2010, the trial court declined to reconsider the substance of its previous order. However, the trial court agreed to dismiss count IV without prejudice.

On August 23, 2010, the parties stipulated to dismissal of count II of defendant's counter-complaint, which resolved the final issue and closed the case.

## II. ANALYSIS

We review de novo a trial court's decision on a motion for summary disposition brought under MCR 2.116(C)(10). *Dressel v Ameribank*, 468 Mich 557, 561; 664 NW2d 151 (2003). When deciding a motion for summary disposition under this rule, a court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence then filed in the action or submitted by the parties in the light most favorable to the nonmoving party. MCR 2.116(G)(5); *Wilson v Alpena Co Rd Comm*, 474 Mich 161, 166; 713 NW2d 717 (2006). The motion is properly granted if the evidence fails to establish a genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. *Michalski v Bar-Levav*, 463 Mich 723, 730; 625 NW2d 754 (2001).

Issues involving either contractual interpretation or the legal effect of a contractual clause are reviewed de novo. *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197; 747 NW2d 811 (2008). "When reviewing a grant of equitable relief, an appellate court will set aside a trial court's factual findings only if they are clearly erroneous, but whether equitable relief is proper under those facts is a question of law that an appellate court reviews de novo." *Id.*

### A. PLAINTIFF'S APPEAL

Plaintiff first argues that the trial court improperly utilized the "material breach doctrine" in deciding whether plaintiff could invoke the forfeiture clause in the Lease. We agree.

"A contract must be interpreted according to its plain and ordinary meaning." *Alpha Capital Mgt v Rentenbach*, 287 Mich App 589, 611; 792 NW2d 344 (2010). When "contractual language is unambiguous and no reasonable person could differ concerning application of the term or phrase to undisputed material facts, summary disposition should be awarded to the proper party." *Id.* at 612.

The forfeiture clause is located in ¶ 26 of the Lease and provides as follows:

> **26. DEFAULT**. Each of the following events shall be a default hereunder by Tenant and a breach of this Lease.
>
> *    *    *
>
> D. If Tenant shall fail to perform any of the agreements, terms, covenants, or conditions hereof on Tenant's part to be performed (other than payment of rent) and such non-performance shall continue for a period within which performance is required to be made by specific provision of this Lease, or if no such period is so provided for, a period of thirty (30) days after notice thereof by Landlord to Tenant, or if such performance cannot be reasonably had within such thirty (30) day period, Tenant shall not in good faith have commenced such performance within such thirty (30) day period and shall not diligently proceed therewith to completion;
>
> *    *    *
>
> If any event specified above shall occur and be continuing, Landlord shall have the right to cancel and terminate this Lease, as well as all of the right, title and interest of Tenant hereunder.

Thus, according to the plain and unambiguous terms of the Lease, plaintiff could "cancel and terminate" the Lease if defendant failed to comply with *any* obligation

(with the exception of the failure to pay rent) and that failure to perform continued for 30 days after defendant was formally notified, pursuant to ¶ 31 of the Lease, of the failure to perform.

As we discuss later in this opinion when we discuss defendant's cross-appeal, we conclude that there is no question of fact that the October 7, 2008, letter complied with the notice requirements of ¶ 31 of the Lease. Therefore, to avoid defaulting under the terms of the Lease, defendant had 30 days from October 8, 2008, to cure its non-performance. The record is clear that defendant did not respond to plaintiff's letter by November 7, 2008. Therefore, under the plain language of ¶ 26, the default occurred on or about November 7, 2008. The trial court correctly reached this conclusion.

Defendant, however, asserts that plaintiff breached the contract first when it recorded a document in the Livingston County Register of Deeds in February 2008. But defendant does not explain what covenant of the Lease plaintiff allegedly violated and also does not provide any authority in support of why this alleged "breach" prevented plaintiff from adhering to other aspects of the Lease. "An appellant may not merely announce his or her position and leave it to this Court to discover and rationalize the basis for his or her claims." *In re Temple Marital Trust*, 278 Mich App 122, 139; 748 NW2d 265 (2008). Consequently, we decline to consider defendant's argument.

Even though the trial court correctly found that defendant breached the Lease, the trial court refused to allow plaintiff to terminate the Lease because it concluded under the "material breach doctrine" that forfeiture of a lease pursuant to a termination clause is not warranted when the breaching party committed an

immaterial breach. We hold that the trial court erred by not applying the plain language of the contract.

This Court has not, in a published opinion, addressed the applicability of the material breach doctrine when the contract at issue contains an express forfeiture clause. Before addressing that question directly, we first note that there is a difference between "rescission," "termination," and "forfeiture" of a contract. Rescission is an equitable remedy that is used to avoid a contract. See *Alibri v Detroit/Wayne Co Stadium Auth*, 254 Mich App 545, 555; 658 NW2d 167 (2002), rev'd on other grounds 470 Mich 895 (2004); Black's Law Dictionary (9th ed).

> Generally, to rescind a contract means to annul, abrogate, unmake, cancel, or avoid it. More precisely, rescission amounts to the unmaking of a contract, or an undoing of it from the beginning, and not merely a termination.
>
> The word "termination" generally refers to an ending, usually before the end of the anticipated term of the contract. Rescission of a contract constitutes termination of that contract with restitution. On the other hand, a forfeiture, properly exercised, terminates a contract without restitution. [17B CJS, Contracts, § 585, pp 18-20 (footnotes omitted).]

In addition:

> A forfeiture is that which is lost, or the right to which is alienated, by a breach of contract. *Unless there is a provision in a contract clearly and expressly allowing forfeiture*, breach of a covenant does not justify cancellation of the entire contract, and courts will generally uphold a forfeiture only where a contract *expressly provides for it*.
>
> The declaration of a forfeiture for the breach of a condition of a contract, in accordance with a stipulation therein, is to be distinguished from a rescission of the contact in that it is an assertion of a right growing out of the contract; if it puts an end to the contract and extin-

guishes it in accordance with its terms similarly to the manner in which it is extinguished by performance. Forfeiture terminates an existing contract without restitution, while a rescission of a contract generally terminates it with restitution and restores the parties to their original status. [17B CJS, Contracts, § 612, p 48 (emphasis added, footnotes omitted).]

In sum, "rescission" terminates a contract and places the parties in their original position, even if restitution is necessary, and "forfeiture" terminates a contract without restitution. Because plaintiff in this case seeks to enforce the termination clause in the contract, we conclude that the equitable remedy of rescission is not applicable. We further conclude that, by reading the default provision of the Lease to include the term "material breach," the trial court effectively rewrote or reformed the contract. See *Titan Ins Co v Hyten*, 291 Mich App 445, 451-452; 805 NW2d 503 (2011) (noting that reformation allows a court to consider a contract to have different terms than provided in the document when those terms fail to express the intentions of the party), rev'd on other grounds 491 Mich 547 (2012).

Our view is supported by our Supreme Court's consistent pronouncements that an unambiguous contract *must* be enforced as written unless it violates the law, is contrary to public policy, or is unenforceable under traditional contract defenses. *Rory v Continental Ins Co*, 473 Mich 457, 470; 703 NW2d 23 (2005); *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 51-52, 62-63; 664 NW2d 776 (2003); See also *Quality Products & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003). In *Rory*, the Supreme Court stated:

This approach, where judges . . . rewrite the contract . . . is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some

highly unusual circumstance such as a contract in violation of law or public policy. This Court has recently discussed, and reinforced, its fidelity to this understanding of contract law . . . . The notion, that free men and women may reach agreements regarding their affairs without government interference and that courts will enforce those agreements, is ancient and irrefutable. It draws strength from common-law roots and can be seen in our fundamental charter, the United States Constitution, where government is forbidden from impairing the contracts of citizens, art I, § 10, cl. 1. Our own state constitutions over the years of statehood have similarly echoed this limitation on government power. It is, in short, an unmistakable and ineradicable part of the legal fabric of our society. Few have expressed the force of this venerable axiom better than the late Professor Arthur Corbin, of Yale Law School, who wrote on this topic in his definitive study of contract law, Corbin on Contracts, as follows:

"One does not have 'liberty of contract' unless organized society both forbears and enforces, forbears to penalize him for making his bargain and enforces it for him after it is made." [*Rory*, 473 Mich at 469-470, quoting *Wilkie*, 469 Mich at 51-52, quoting 15 Corbin, Contracts (Interim ed), ch 79, § 1376, p 17 (footnotes omitted).]

Although *Rory* did not expressly decide whether a contract forfeiture clause was enforceable, it made clear that a court has no power to ignore a contract's plain and unambiguous term because the court holds the view that the term ostensibly was "unreasonable." *Rory*, 473 Mich at 468-469. *Rory* is applicable here on this very point; this Court cannot refuse to enforce the plain and unambiguous terms of the lease herein on the basis that the forfeiture clause is "unfair." Hence, we reiterate the Supreme Court's holding that courts are not free to rewrite or ignore the plain and unambiguous language of contracts except in exceptional circumstances. *Id.* at 470.

Defendant has not established that the requisite exceptional circumstances exist in this case sufficient to justify ignoring the plain language of its contract with plaintiff. First, defendant makes no claim that the forfeiture provision violates the law. Likewise, we find that the forfeiture clause is not contrary to public policy.

> [T]he determination of Michigan's public policy "is not merely the equivalent of the personal preferences of a majority of [the Supreme] Court; rather, such a policy must ultimately be clearly rooted in the law." In ascertaining the parameters of our public policy, we must look to "policies that, in fact, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law." [*Id.* at 470-471, quoting *Terrien v Zwit*, 467 Mich 56, 66-67; 648 NW2d 602 (2002).]

While the Legislature has limited the effectiveness of express forfeiture clauses in land contracts, MCL 600.5726 (requiring the occurrence of a material breach as a precondition of forfeiture of a land contract, regardless of whether the contract has an explicit termination or forfeiture clause), the Legislature notably has not limited the operation of forfeiture clauses in other contexts. Additionally, forfeiture clauses have existed in contracts in this state for more than 100 years. See, e.g., *Hamilton v Wickson*, 131 Mich 7, 73-76; 90 NW 1032 (1902); *Satterlee v Cronkhite*, 114 Mich 634, 635-636; 72 NW 616 (1897). Thus, we cannot conclude that forfeiture clauses in a contract that is *not* a land contract violate public policy.

As the *Rory* Court stated, "[o]nly recognized traditional contract defenses may be used to avoid the enforcement of [legal] contract provision[s]." *Rory*, 473 Mich at 470. Such defenses include duress, waiver, estoppel, fraud, and unconscionability. *Id.* at 470 n 23. The only recognized defense that could possibly be

relied on in this case, based on defendant's pleadings, is the doctrine of unconscionability. However, "[i]n order for a contract or contract provision to be considered unconscionable, *both procedural and substantive unconscionability must be present.*" *Clark v DaimlerChrysler Corp*, 268 Mich App 138, 143; 706 NW2d 471 (2005) (emphasis added).

> Procedural unconscionability exists where the weaker party had no realistic alternative to acceptance of the term. If, under a fair appraisal of the circumstances, the weaker party was free to accept or reject the term, there was no procedural unconscionability. Substantive unconscionability exists where the challenged term is not substantively reasonable. However, a contract or contract provision is not invariably substantively unconscionable simply because it is foolish for one party and very advantageous to the other. Instead, a term is substantively unreasonable where the inequity of the term is so extreme as to shock the conscience. [*Id.* at 144 (citations omitted).]

Here, there was no evidence that defendant was in a weaker position than plaintiff and was forced to accept the forfeiture term. Thus, defendant cannot establish any procedural unconscionability. We also conclude that the forfeiture clause was not substantively unconscionable. While the term undoubtedly favors plaintiff, the advantage given to plaintiff in the contract does not shock the conscience. In addition, forfeiture did not occur immediately upon defendant's breach; the Lease allowed defendant 30 days to cure any breach before the Lease would be terminated. Under these circumstances, the forfeiture clause was not "substantively unreasonable." Therefore, the forfeiture provision was not avoidable under the unconscionability doctrine.

In sum, "a court may not revise or void the unambiguous language of [an] agreement to achieve a result that it views as fairer or more reasonable." *Rory*, 473

Mich at 489. As a result, the trial court erred when it failed to enforce the forfeiture clause of the Lease based on defendant's breach not being a "material breach." As a matter of law, plaintiff successfully invoked the default provision of the Lease and terminated the Lease on November 24, 2008. Under ¶ 17 of the Lease, the Lease's termination also extinguished defendant's option to purchase. Hence, because the Lease was terminated on that date, defendant's attempt to exercise the Lease's option-to-purchase provision on December 22, 2008, was void.

### B. DEFENDANT'S CROSS-APPEAL

Defendant argues that it did not breach the contract when it failed to consent to the easement agreement. Specifically, defendant argues that (1) the easement agreement was to be finalized and executed at the conclusion of the merger negotiations, (2) the parties never reached an agreement with respect to the terms of the easement, and (3) plaintiff's October 7, 2008, letter did not comply with the notice provision of Paragraph 26. We conclude that defendant was not excused from complying with its obligation under the Lease.

In pertinent part, ¶ 22 of the Lease stated:

> Tenant *shall* permit drainage and utility easements and road crossings to be developed by Landlord on the Premises *as required* to permit development to occur on Landlord's Other Real Estate. [Emphasis added.]

Thus, defendant was required to consent to plaintiff's Road Easement. The Lease, however, did provide that the location of any easements must be "in areas mutually agreeable." As such, the only valid reason to withhold consent to the Road Easement would have

been the failure to agree on a location. However, there was no evidence to show that defendant's refusal to consent was based on an objection to the location.[3] We note that during the 30-day window that followed Crouse's October 7, 2008, letter, defendant failed to make *any* objection or provide any rationale for its refusal to consent. Defendant's next communication was issued on November 10, 2008, which was after the 30-day deadline expired. Therefore, defendant's failure to consent to the Road Easement was a breach of the plain and unambiguous terms of the Lease.

Defendant also argues that consent to the Road Easement was not required because it was contingent upon finalization of the merger agreement. While the parties undoubtedly discussed that consent would occur contemporaneous to a merger, there was no evidence that the parties intended to amend, or did amend, the provision of the Lease that defendant give consent "as required."

Defendant further contends that the easement agreement was not ripe for its consent because the agreement failed to capture other conditions, such as (1) noting that all costs were plaintiff's responsibility, (2) ensuring that the integrity of the golf course would not be disturbed, and (3) ensuring that the golf course would be left in an equal or better condition when the work was complete. Nothing in Paragraph 22 makes defendant's requirements to grant an easement contingent on these asserted conditions.[4] Thus, defendant's

---

[3] In fact, the document that defendant *provided* to plaintiff in December 2008 used the same location for the easement that plaintiff initially proposed.

[4] We note that if plaintiff were to have undermined the integrity or condition of the golf course through construction or maintenance of easements, defendant would have been entitled to a variety of possible contract remedies.

insistence that the Lease required these provisions in any easement agreement is without merit.

Last, defendant claims that plaintiff's October 7, 2008, letter did not satisfy the notice requirements spelled out in ¶ 31 of the Lease. We disagree. Paragraph 31 provides in pertinent part,

> Whenever it is provided herein that notice, demand, request, or other communication shall or may be given to or served upon either of the parties by the other, and whenever either of the parties shall desire to give or serve upon the other any notice, demand, request, or other communication with respect hereto or with respect to the Premises, each such notice, demand, request, or other communication shall be in writing and, any law or statute to the contrary notwithstanding, shall be effective for any purpose if given or served as follows:

> A. If by Landlord, by mailing the same to Tenant by registered mail, postage prepaid, return receipt requested . . . .

Defendant claims that the October 7, 2008, letter was deficient in several ways: (1) it was not sent via registered mail, (2) the letter did not provide any notice, and (3) the letter did not indicate what consequences would happen if the 30-day deadline was not met.

Nothing in the record supports defendant's claim that the letter was not sent via registered mail. Defendant cites to the letter itself and cites to Crouse's affidavit as evidence of the letter not being sent via registered mail. However, the letter does not identify either way how it was mailed. And Crouse states in his affidavit that he mailed the letter "consistent with notice provisions contained in the Lease."

Defendant's remaining claims of deficiencies are also without merit. The Lease does not require the written notice to contain any specific words, such as "notice" or

"default." In this case, the letter referred to defendant's continuing obligation under ¶ 22 of the Lease to provide the consent, explained that defendant has been delinquent for nearly a year, and established a 30-day time period to cure the defect. This 30-day time period matches the 30-day time period of ¶ 26. Therefore, the trial court correctly concluded that the letter satisfied the notice requirements of the Lease.

Defendant's final issue on cross-appeal relates to whether its invoking of the option to purchase was invalid. As already discussed, we conclude that plaintiff properly terminated the Lease prior to defendant invoking the option, thereby making defendant's attempt to purchase void. Although the trial court concluded that defendant could not invoke the option to purchase for different reasons, we will not reverse a trial court's ruling when it reaches the right result for the wrong reason. *Coates v Bastian Bros, Inc*, 276 Mich App 498, 508-509; 741 NW2d 539 (2007).

### C. CONCLUSION

In conclusion, the trial court erred when it did not interpret the Lease according to its plain and unambiguous terms. On remand, the trial court is to enter an order granting summary disposition in favor of plaintiff on counts I, II, and V of its complaint.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Plaintiff, the prevailing party, may tax costs pursuant to MCR 7.219.

TALBOT and SERVITTO, JJ., concurred with WILDER, P.J.